UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LINDSAY HECOX, *et al*., | Case No.  1:20-cv-00184-DCN |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| BRADLEY LITTLE, *et al*.; | |
| Defendants. | |

This matter is before the Court on Plaintiffs' Motion for Preliminary Injunction, proposed intervenors' Motion to Intervene, and Defendants' Motion to Dismiss. The Court held oral argument on July 22, 2020 and took the matters under advisement.

Upon review, and for the reasons stated below, the Court GRANTS the Motion for Preliminary Injunction (Dkt. 22); GRANTS the Motion to Intervene (Dkt. 30); and GRANTS in PART and DENIES in PART the Motion to Dismiss (Dkt. 40).

## I. OVERVIEW

Plaintiffs in this case challenge the constitutionality of a new Idaho law which excludes transgender women from participating on women's sports teams. Defendants assert Plaintiffs lack standing, that their claims are not ripe for review, that certain of their claims fail as a matter of law, and that they are not entitled to injunctive relief. The proposed intervenors seek to intervene to advocate for their interests as female athletes and

to defend the law Plaintiffs challenge. The United States has also filed a Statement of Interest in support of Idaho's law. Dkt. 53.

The primary question before the Court—whether the Court should enjoin the State of Idaho from enforcing a newly enacted law which precludes transgender female athletes from participating on women's sports—involves complex issues relating to the rights of student athletes, physiological differences between the sexes, an individual's ability to challenge the gender of other student athletes, female athlete's rights to medical privacy and to be free from potentially invasive sex identification procedures, and the rights of all students to have complete access to educational opportunities, programs, and activities available at school. The debate regarding transgender females' access to competing on women's sports teams has received nationwide attention and is currently being litigated in both traditional courts and the court of public opinion.

Despite the national focus on the issue, Idaho is the first and only state to categorically bar the participation of transgender women in women's student athletics. This categorical bar to girls and women who are transgender stands in stark contrast to the policies of elite athletic bodies that regulate sports both nationally and globally—including the National Collegiate Athletic Association ("NCAA") and the International Olympic Committee ("IOC")—which allow transgender women to participate on female sports teams once certain specific criteria are met.

In addition to precluding women and girls who are transgender and many who are intersex from participating in women's sports, Idaho's law establishes a "dispute" process that allows a currently undefined class of individuals to challenge a student's sex. Idaho

Code § 33-6203(3). If the sex of any female student athlete—whether transgender or not—is disputed, the student must undergo a potentially invasive sex verification process. This provision burdens all female athletes with the risk and embarrassment of having to "verify" their "biological sex" in order to play women's sports. *Id*. Similarly situated men and boys—whether transgender or not—are not subject to the dispute process because Idaho's law does not restrict individuals who wish to participate on men's teams.

Finally, as an enforcement mechanism, Idaho's law creates a private cause of action against a "school or institution of higher education" for any student "who is deprived of an athletic opportunity" or suffers any harm, whether direct or indirect, due to the participation of a woman who is transgender on a women's team. *Id*. § 33-6205(1). Idaho schools are also precluded from taking any "retaliation or other adverse action" against those who report an alleged violation of the law, regardless of whether the report was made in good faith or simply to harass a competitor. *Id*. at § 33-6205(2).

Plaintiffs seek a preliminary injunction which would enjoin enforcement of Idaho's law pending trial on the merits. The Court will ultimately be required to decide whether Idaho's law violates Title IX and/or is unconstitutional, but that is not the question before the Court today. The question currently before the Court is whether Plaintiffs have met the criteria for enjoining enforcement of Idaho's law *for the present time* until a trial on the merits can be held. To issue an injunction preserving the status quo by enjoining the law's enforcement, the Court must primarily decide whether Plaintiffs have constitutional and prudential standing to challenge the law, whether they state facial or only as-applied constitutional challenges, and whether they are likely to succeed on their claim, based upon

MEMORANDUM DECISION AND ORDER - 3

the current record, that the law violates the Equal Protection Clause of the Fourteenth Amendment.

## II. BACKGROUND

On March 30, 2020, Idaho Governor Bradley Little ("Governor Little") signed the Fairness in Women's Sports Act (the "Act") into law. Idaho Code Ann. § 33-6201–6206.[1] Plaintiffs' Complaint challenges the constitutionality of the Act. Among other things, Plaintiffs contend that the Act violates their constitutional rights to equal protection, due process, and the right to be free from unconstitutional searches and seizures. Plaintiffs seek preliminary relief solely on their equal protection claim, arguing the Act discriminates on the basis of transgender status by categorically barring transgender women from participating in women's sports, and also discriminates on the basis of sex by subjecting all women student-athletes to the risk of having to undergo invasive, unnecessary tests to "verify" their sex, while permitting all men student-athletes to participate in men's sports without such risk. Plaintiffs seek a preliminary injunction to enjoin enforcement of the Act pending trial on the merits.

### A. Definitions

As the Third Circuit recently explained, in the context of issues such as those raised in the instant case, "such seemingly familiar terms as 'sex' and 'gender' can be misleading." *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 522 (3d Cir. 2018). The Court accordingly begins by defining relevant terms utilized in this decision.

---

[1] The Act went into effect on July 1, 2020. Idaho Code § 33-6201.

"Sex" is defined as the "anatomical and physiological processes that lead to or denote male or female. Typically, sex is determined at birth based on the appearance of external genitalia." *Id.*

A person's "gender identity" is his or her "deep-core sense of self as being a particular gender." *Id.* "Although the detailed mechanisms are unknown, there is a medical consensus that there is a significant biologic component underlying gender identity." Dkt. 22-9, ¶ 18.[2]

The term "cisgender" refers to a person who identifies with the sex that person was determined to have at birth. *Boyertown*, 897 F.3d at 522.

"Transgender" refers to "a person whose gender identity does not align with the sex that person was determined to have at birth." *Id.* A transgender woman "is therefore a person who has a lasting, persistent female gender identity, though the person's sex was determined to be male at birth." *Id.*

Transgender individuals may experience "gender dysphoria," which is "characterized by significant and substantial distress as result of their birth-determined sex being different from their gender identity." *Id.* "In order to be diagnosed with gender

---

[2] The Court relies on various declarations filed in support of the Motion for Preliminary Injunction and Motion to Intervene for medical definitions of the terms used herein, and to identify the proposed intervenors and their arguments. The Court also considers extra-pleading materials when assessing Plaintiffs' Motion for Preliminary Injunction. The Court does not, however, rely on extra-pleading materials (other than those of which it takes judicial notice) in its assessment of Defendants' Motion to Dismiss, and accordingly does not treat the Motion to Dismiss as a Motion for Summary Judgment. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 921–22 (9th Cir. 2004) (finding a represented party's submission of extra-pleading materials justified treating the motion to dismiss as a motion for summary judgment). Pursuant to Federal Rule of Evidence 201(c), the Court has discretionary authority to take judicial notice, regardless of whether it is requested to do so by a party, and does in fact do so in this case as it relates to certain materials identified below. Fed. R. Evid. 201.

dysphoria, the incongruence must have persisted for at least six months and be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning." Dkt. 22-2, ¶ 19. If left untreated, symptoms of gender dysphoria can include severe anxiety and depression, suicidality, and other serious mental health issues. *Id*. at ¶ 20. Attempted suicide rates in the transgender community are over 40%. Dkt. 1, at ¶ 103.

The term "intersex" is an umbrella term for a person "born with unique variations in certain physiological characteristics associated with sex, "such as chromosomes, genitals, internal organs like testes or ovaries, secondary sex characteristics, or hormone production or response." Dkt. 22-1, at 2 (citing Dkt. 22-2, ¶ 41). Some intersex traits are identified at birth, while others may not be discovered until puberty or later in life, if ever. *See generally* Dkt. 22-2, at 11–16.

### B. The Parties

#### 1. *Plaintiffs*

Plaintiffs in this action include Lindsay Hecox, and Jean and John Doe on behalf of their minor daughter, Jane Doe (collectively "Plaintiffs").[3] Lindsay is a transgender woman athlete who lives in Idaho and attends Boise State University ("BSU"). As part of her treatment for gender dysphoria, Lindsay has undergone hormone therapy by being treated with testosterone suppression and estrogen, which lower her circulating testosterone levels and affect her bodily systems and secondary sex characteristics. Dkt. 1, ¶ 29. Lindsay is a

---

[3] Plaintiffs Jean, John, and Jane Doe have been granted permission to proceed under pseudonyms. Dkt. 48.

life-long runner who intends to try out for the BSU women's cross-country team in fall 2020, and for the women's track team in spring 2021. *Id.* at ¶ 33. Under current NCAA rules, Lindsay could compete at NCAA events in September—when she has completed one year of hormone treatment.[4] *Id.* at ¶ 32.

Jane is a 17-year old girl and athlete who is cisgender. Dkt. 1, ¶¶ 39, 42. Jane has played sports since she was four and competes on the soccer and track teams at Boise High School, where she is a rising senior. *Id.* at ¶¶ 40, 45. After tryouts in August, Jane intends to play on Boise High's soccer team again in fall 2020.[5] *Id.* Because most of her closest friends are boys, she has an athletic build, rarely wears skirts or dresses, and has at times been thought of as "masculine," Jane worries that one of her competitors may dispute her sex pursuant to section 33-6203(3) of the Act. *Id.* at ¶ 47.

### 2. *Defendants*

The defendants named in this action (collectively "Defendants") include Governor Little; Idaho Superintendent of Public Instruction Sherri Ybarra; the individual members of the Idaho State Board of Education (Debbie Critchfield, David Hill, Emma Atchley, Linda Clark, Shawn Keough, Kurt Liebich, and Andrew Scoggin); Idaho state educational institutions BSU and Independent School District of Boise City #1 ("Boise School

---

[4] Due to the COVID-19 pandemic, the Mountain West conference in which BSU participates recently postponed sports competitions for fall sports. However, as of the date of this decision, BSU has not announced whether it will alter the training programs or tryouts for the cross-country team, and the Court has been advised by Plaintiffs' counsel that Lindsay is continuing her individual training program in preparation for tryouts.
[5] Although try-outs for the Boise High soccer team have recently been postponed, the Court has been advised that small group training for the girls' soccer team may begin as early as August 17, 2020.

District"); BSU's President, Dr. Marlene Tromp; Superintendent of the Boise School District, Coby Dennis; the individual members of the Boise School District's Board of Trustees (Nancy Gregory, Maria Greeley, Dennis Doan, Alicia Estey, Dave Wagers, Troy Rohn, and Beth Oppenheimer); and the individual members of the Idaho Code Commission (Daniel Bowen, Andrew Doman, and Jill Holinka).

### 3. Proposed Intervenors

Proposed intervenors Madison ("Madi") Kenyon and Mary ("MK") Marshall (collectively "Madi and MK" or the "Proposed Intervenors") are Idaho cisgender female athletes. Like Lindsay and Jane, Madi and MK are "female athletes for whom sports is a passion and life-defining pursuit." Dkt. 30-1, at 2. Madi and MK both run track and cross-country on scholarship at Idaho State University ("ISU") in Pocatello, Idaho. *Id*. Both competed against a transgender woman athlete last year at the University of Montana and had "deflating experiences" of running against and losing to that athlete. *Id*., at 3; Dkt. 30-2, ¶¶ 12, 14–15; Dkt. 30-3, ¶ 11. The Proposed Intervenors support the Act and wish to have their personal concerns fully set forth and represented in this case.

### C. The Act

### 1. Overview

Idaho passed House Bill 500 ("H.B. 500"), the genesis for the Act, on March 16, 2020. Dkt. 1, ¶ 90. In the United States, high school interscholastic athletics are generally governed by state interscholastic athletic associations, such as the Idaho High School Activities Association ("IHSAA"). *Id*. at ¶ 66. The NCAA sets policies for member colleges and universities, including BSU. *Id*. at ¶ 67. Prior to the passage of H.B. 500, the

IHSAA policy allowed transgender girls in K-12 athletics in Idaho to compete on girls' teams after completing one year of hormone therapy suppressing testosterone under the care of a physician for purposes of gender transition. *Id*. at ¶ 71. Similarly, the NCAA policy allows transgender women attending member colleges and universities in Idaho to compete on women's teams after one year of hormone therapy suppressing testosterone. *Id*. at ¶ 75.

### 2. Legislative History

On February 13, 2020, H.B. 500 was introduced in the Idaho House by Representative Barbara Ehardt ("Rep. Ehardt"). On February 19, 2020, the House State Affairs Committee heard testimony on H.B. 500. *Id*. at ¶ 80. Ty Jones, Executive Director of the IHSAA, answered questions at that hearing and noted that no Idaho student had ever complained of participation by transgender athletes, and no transgender athlete had ever competed under the IHSAA policy regulating inclusion of transgender athletes. *Id*. at ¶ 81. In addition, millions of student-athletes have competed in the NCAA since it adopted its policy in 2011 of allowing transgender women to compete on women's teams after one year of hormone therapy suppressing testosterone, with no reported examples of any disturbance to women's sports as a result of transgender inclusion. *Id*. at ¶ 76. Rep. Ehardt admitted during the hearing that she had no evidence any person in Idaho had ever challenged an athlete's eligibility based on gender. *Id*. at ¶ 80.

On February 21, 2020, H.B. 500 was passed out of the House committee. *Id*. at ¶ 82. On February 25, 2020, Idaho Attorney General Lawrence Wasden ("Attorney General Wasden") warned in a written opinion letter that H.B. 500 raised serious constitutional and

other legal concerns due to the disparate treatment and impact it would have on both transgender and intersex athletes, as well as its potential privacy intrusion on all female student athletes. *Id*. at ¶ 83. On February 26, 2020, the House debated the bill. Rep. Ehardt referred to two high school athletes in Connecticut and one woman in college who are transgender and who participated on teams for women and girls. *Id*. at ¶ 84. Rep. Ehardt argued that the mere fact of these athletes' participation exemplified the "threat" the bill sought to address. *Id*. The bill passed the House floor after the debate. *Id*.

After passage in the House, H.B. 500 was heard in the Senate State Affairs Committee and was passed out of Committee on March 9, 2020. *Id*. at ¶ 85. The next day, the bill was sent to the Committee of the Whole Senate for amendment, and minor amendments were made. *Id*. at ¶ 86. One day later, on March 11, 2020, the World Health Organization declared COVID-19 a pandemic and many states adjourned state legislative sessions indefinitely. *Id*. at ¶ 89. By contrast, the Idaho Senate remained in session and passed H.B. 500 as amended on March 16, 2020. *Id*. at ¶ 90. After the House concurred in the Senate amendments, the bill was delivered to Governor Little on March 19, 2020. *Id*.

Professor Dorianne Lambelet Coleman, whose work was cited in the H.B. 500 legislative findings, urged Governor Little to veto the bill, explaining her research was misused and that "there is no legitimate reason to seek to bar all trans girls and women from girls' and women's sport, or to require students whose sex is challenged to prove their eligibility in such intrusive detail." *Id*. at ¶ 91. Professor Coleman endorsed the existing NCAA rule, which mirrors the IHSAA policy, and stated: "No other state has enacted such a flat prohibition against transgender athletes, and Idaho shouldn't either." *Id*.

Five former Idaho Attorneys General likewise urged Governor Little to veto the bill "to keep a legally infirm statute off the books." *Id*. at ¶ 92. They urged Governor Little to "heed the sound advice" of Attorney General Wasden, who had "raised serious concerns about the legal viability and timing of this legislation." *Id*. Nevertheless, based on legislative findings that, *inter alia*, "inherent, physiological differences between males and females result in different athletic capabilities," Governor Little signed H.B. 500 into law on March 30, 2020.[6] Idaho Code § 33-6202(8); Dkt. 1, ¶ 93.

For purpose of the instant motions, the Act contains three key provisions. First, the Act provides that "interscholastic, intercollegiate, intramural, or club athletic teams or sports that are sponsored by a public primary or secondary school, a public institution of higher education, or any school or institution whose students or teams compete against a public school or institution of higher education" shall be "expressly designated as one (1) of the following based on biological sex: (a) Males, men, or boys; (b) Females, women, or girls; or (c) Coed or mixed." Idaho Code § 33-6203(1). The Act mandates, "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex." *Id*. at § 33-6203(2). The Act does not contain comparable limitation for any individuals—whether transgender or cisgender—who wish to participate on a team designated for males.

---

[6] On the same day, Governor Little also signed another bill into law, H.B. 509, which essentially bans transgender individuals from changing their gender marker on their birth certificates to match their gender identity. *Id*. at ¶ 93–94. Enforcement of H.B. 509 is currently being litigated in *F.V. and Dani Martin v. Jeppesen et al*., 1:17-cv-00170-CWD, because another judge of this Court previously permanently enjoined Idaho from enforcing a prior law that restricted transgender individuals from altering the sex designation on their birth certificates. *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1146 (D. Idaho 2018).

Second, the Act creates a dispute process for an undefined class of individuals who may wish to "dispute" any transgender or cisgender female athlete's sex. This provision provides:

> A dispute regarding a student's sex shall be resolved by the school or institution by requesting that the student provide a health examination and consent form or other statement signed by the student's personal health care provider that shall verify the student's biological sex. The health care provider may verify the student's biological sex as part of a routine sports physical examination relying only on one (1) or more of the following: the student's reproductive anatomy, genetic makeup, or normal endogenously produced testosterone levels. The state board of education shall promulgate rules for schools and institutions to follow regarding the receipt and timely resolution of such disputes consistent with this subsection.

*Id*. at § 33-6203(3).

Third, the Act creates an enforcement mechanism to ensure compliance with its provisions. Specifically, the Act creates a private cause of action for any student negatively impacted by violation of the Act, stating:

> (1) Any student who is deprived of an athletic opportunity or suffers any direct or indirect harm as a result of a violation of this chapter shall have a private cause of action for injunctive relief, damages, and any other relief available under law against the school or institution of higher education.

> (2) Any student who is subject to retaliation or other adverse action by a school, institution of higher education, or athletic association or organization as a result of reporting a violation of this chapter to an employee or representative of the school, institution, or athletic association or organization, or to any state or federal agency with oversight of schools or institutions of higher education in the state, shall have a private cause of action for injunctive relief, damages, and any other relief available under law against the school, institution, or athletic association or organization.

> (3) Any school or institution of higher education that suffers any direct or

indirect harm as a result of a violation of this chapter shall have a private cause of action for injunctive relief, damages, and any other relief available under law against the government entity, licensing or accrediting organization, or athletic association or organization.

(4) All civil actions must be initiated within two (2) years after the harm occurred. Persons or organizations who prevail on a claim brought pursuant to this section shall be entitled to monetary damages, including for any psychological, emotional, and physical harm suffered, reasonable attorney's fees and costs, and any other appropriate relief.

*Id*. at § 33-6205.

### D. Procedural Background

Plaintiffs filed the instant suit on April 15, 2020. The lawsuit primarily seeks: (1) a judgment declaring that the Act violates the United States Constitution and Title IX, and also violates such rights as applied to Plaintiffs; (2) preliminary and permanent injunctive relief enjoining the Act's enforcement; and (3) an award of costs, expenses, and reasonable attorneys' fees. *Id*. at 53–54. On April 30, 2020, Plaintiffs filed the instant Motion for Preliminary Injunction, seeking preliminary relief on their Equal Protection Claim. Dkt. 22. The Proposed Intervenors filed a Motion to Intervene on May 26, 2020 (Dkt. 30), and Defendants filed a Motion to Dismiss on June 1, 2020. Dkt. 40. After each was fully briefed, the Court held oral argument on all three motions on July 22, 2020.

### III. ANALYSIS

Since there are three pending motions with different applicable legal standards, the Court will set forth the appropriate legal standard when addressing each motion. Because the Court's decision on the Motion to Intervene will determine the parties in this action, and its decision on the Motion to Dismiss will determine whether Plaintiffs may bring their

MEMORANDUM DECISION AND ORDER - 13

Motion for a Preliminary Injunction, the Court begins with the Motion to Intervene, follows with Defendants' Motion to Dismiss, and, since the Court finds the Motion to Dismiss is appropriately denied in part and granted in part, concludes with consideration of the Motion for Preliminary Injunction.

### A.    Motion to Intervene (Dkt. 30)

The Proposed Intervenors seek to intervene to advocate for their interests and to defend the Act, arguing they "face losses to male athletes" and "stand opposed to any legally sanctioned interference with the opportunities that they have enjoyed as female competitors, and that would deprive them and other young women of viable avenues of competitive enjoyment and success within a context that acknowledges and honors them as females." Dkt. 30-1, at 4. The Proposed Intervenors request intervention as a matter of right, or, alternatively, permissive intervention, under Federal Rule of Civil Procedure 24. Plaintiffs oppose the Motion to Intervene. Dkt. 45; Dkt. 51-1. Defendants are in favor of intervention and suggest the Proposed Intervenors' perspectives "can help inform the Court when it balances hardships and determines the public consequences of the relief Plaintiffs seek." Dkt. 44, at 2.

#### 1.  Legal Standard

Where, as here, an unconditional right to intervene in not conferred by federal statute,[7] Federal Rule of Civil Procedure 24 authorizes intervention as of right or permissive intervention.

---

[7] While a federal statute does not authorize intervention by the Proposed Intervenors, the United States is statutorily authorized to intervene in cases of general public importance involving alleged denials of equal

Rule 24(a) contains the standards for intervention as of right, and provides that a court must permit anyone to intervene who, on timely motion: "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2).

The Ninth Circuit has distilled the aforementioned provision into a four-part test for intervention as of right: (1) the application for intervention must be timely; (2) the applicant must have a "significantly protectable" interest relating to the property or transaction that is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest; and (4) the applicant's interest must be inadequately represented by existing parties in the lawsuit. *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 817 (9th Cir. 2001) ("*Berg*") (citation omitted).

The Court must construe Rule 24(a)(2) liberally in favor of intervention. *Id*. at 818. In assessing interventions, courts are "guided primarily by practical and equitable considerations." *Arakaki v. Cayetano*, 324 F.3d 1078, 1083 (9th Cir. 2003) (citing *Donnelly v. Glickman*, 159 F.3d 405, 409 (9th Cir. 1998)). However, it is the movant's burden to show that it satisfies each of the four criteria for intervention as of right. *Prete v. Bradbury*, 438 F.3d 949, 954 (9th Cir. 2006)

---

protection on the basis of sex. 28 U.S.C. § 517; *see also United States v. Virginia*, 518 U.S. 515, 523 (1996). The United States filed its Statement of Interest in support of the Act pursuant to 28 U.S.C. § 517. Dkt. 53.

In general, Rule 24(b) also gives the court discretion to allow permissive intervention to anyone who has a claim or defense that shares with the main action a common question of law or fact. Fed. R. Civ. P. 24(b)(1)(B). In addition, in exercising its discretion under Rule 24(b), the Court must consider whether intervention will unduly delay or prejudice the adjudication of the original parties' rights. Fed. R. Civ. P. 24(b)(3).

2. *Analysis*

a. Intervention as of Right

Plaintiffs argue intervention as of right should be denied because the Proposed Intervenors claim interests that are neither cognizable under the law nor potentially impaired by the disposition of the present lawsuit. Plaintiffs also argue intervention as of right is unavailable because Defendants adequately represent the Proposed Intervenors' interests.

**i. Timeliness of Application**

In support of their arguments against permissive intervention, Plaintiffs suggest the Proposed Intervenors' participation will likely delay and prejudice the adjudication of Plaintiffs' claims. Dkt. 45, at 17. Plaintiffs do not, however, contest the timeliness of the application to intervene with respect to intervention as of right. To the extent necessary, the Court will accordingly address the timeliness of the application when assessing permissive intervention.

**ii. Protectable Interest**

To warrant intervention as of right, a movant must show both "an interest that is

protected under some law" and "a 'relationship' between its legally protected interest and the plaintiff's claims." *California ex rel. Lockyer v. United States*, 450 F.3d 436, 441 (9th Cir. 2006) ("*Lockyer*") (quoting *Donnelly*, 159 F.3d at 409). "Whether an applicant for intervention demonstrates sufficient interest in an action is a practical, threshold inquiry. No specific legal or equitable interest need be established." *Berg*, 268 F.3d at 818 (citing *Greene v. United States*, 996 F.2d 973, 976 (9th Cir. 1993)).

The Proposed Intervenors claim a significant and protected interest in having and maintaining "female-only competitions and a competitive environment shielded from physiologically advantaged male participants to whom they stand to lose." Dkt. 30-1, at 7; *see also* Dkt. 52, at 4 n. 1. Plaintiffs characterize this interest as a mere desire to exclude transgender students from single-sex sports, which is not significantly protectable. Dkt. 45, at 10–11. As Plaintiffs note, the Ninth Circuit has held cisgender students do not have a legally protectable interest in excluding transgender students from single-sex spaces. *Parents for Privacy v. Barr*, 949 F.3d 1210, 1228 (9th Cir. 2020) (rejecting Title IX and constitutional claims of cisgender students based on having to share single sex restrooms and locker facilities with transgender students).

However, the Ninth Circuit has also held that redressing past discrimination against women in athletics and promoting equality of athletic opportunity between the sexes is unquestionably a legitimate and important interest, which is served by precluding males from playing on teams devoted to female athletes. *Clark, ex rel. Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982) ("*Clark*"). Regardless of how the Proposed Intervenors' interest is characterized—either as a right to a level playing field

or as a more invidious desire to exclude transgender athletes—they do claim a protectable interest in ensuring equality of athletic opportunity. The importance of this interest is the basic premise of almost fifty years of Title IX law as it applies to athletics, and, as recognized by the Ninth Circuit, is unquestionably a legitimate and important interest. *Clark*, 695 F.2d at 1131. The Proposed Intervenors argue the only way to protect equality in sports is through sex segregation without regard to gender identity. Whether this argument is accurate or constitutional is not dispositive of the issue of whether the Proposed Intervenors have an interest in this suit.

Just as Plaintiffs have an interest in seeking equal opportunity for transgender female student athletes, the Proposed Intervenors have an interest in seeking equal opportunity for cisgender female student athletes. As such, to find the Proposed Intervenors are without a protectable interest in the subject matter of this litigation would be to hold that no party has an interest in this litigation. *See, e.g., Johnson v. San Francisco Unified Sch. Dist.*, 500 F.2d 349, 353 (9th Cir. 1974) (explaining all students and parents have an interest in a sound educational system, and that interest is surely no less significant where it is entangled with the constitutional claims of a racially defined class).

Further, Defendants acknowledged at oral argument what seems beyond dispute— Idaho passed the Act to protect cisgender female student athletes like Madi and MK. Because the Proposed Intervenors are the "intended beneficiaries" of the Act, their interest is neither "undifferentiated" nor "generalized." *Lockyer*, 450 F.3d at 441 (citation omitted); *see also Cty. of Fresno v. Andrus*, 622 F.2d 436, 438 (9th Cir. 1980) (finding small farmers had a protectable interest in action seeking to enjoin a federal statute passed regarding lands

receiving federally subsidized water where the small farmers were "precisely those Congress intended to protect" with the statute). If the Act is declared unconstitutional or substantially narrowed as result of this litigation, Madi and MK may be more likely to have to choose between competing against transgender athletes or not competing at all. Such an interest is sufficiently "direct, non-contingent, [and] substantial" to constitute a significant protectible interest in this action. *Lockyer*, 450 F.3d at 441 (alteration in original) (quoting *Dilks v. Aloha Airlines*, 642 F.2d 1155, 1157 (9th Cir. 1981)).[8]

### iii. Impairment of Interest

The "significantly protectable interest" requirement is closely linked with the requirement that the outcome of the litigation may impair the proposed intervenors' interests. *Lockyer*, 450 F.3d at 442 ("Having found that [intervenors] have a significant protectable interest, we have little difficulty concluding that disposition of this case, may, as a practical matter, affect [them]."). If a proposed intervenor "'would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene.'" *Berg*, 268 F.3d at 822 (quoting Fed. R. Civ. P. 24 advisory committee note to 1966 amendment).

The relief requested by Plaintiffs may affect the Proposed Intervenors' interests. Should Plaintiffs prevail in this lawsuit, the Proposed Intervenors will not have the

---

[8] Plaintiffs also argue the outcome of this lawsuit will not advance the Proposed Intervenors' claimed interests because Madi and MK, as collegiate athletes, will still be required to compete against non-Idaho teams and athletes who are subject to the rules of the NCAA, which allow participation of women who are transgender after one year of testosterone suppression. Yet, the fact that a challenged law may only partially protect an intervenor from harm does not mean that the intervenor does not have an interest in preserving that partial protection, and Plaintiffs do not cite any authority to the contrary.

protection of the law they claim is vital to ensure their right to equality in athletics. Further, they "will have no legal means to challenge [any] injunction" that may be granted by this Court. *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1498 (9th Cir. 1995) (abrogated by further broadening of intervention as of right for claims brought under the National Environmental Policy Act in *Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011)); *see also Lockyer*, 450 F.3d at 443 (finding impairment where proposed intervenors would have no alternative forum to contest the interpretation of a law that was "struck down" or had its "sweep substantially narrowed"). Under such circumstances, the Proposed Intervenors satisfy the impairment requirement for intervention as of right.

### iv. Adequacy of Representation

The "most important factor" to determine whether a proposed intervenor is adequately represented by an existing party to the action is "how the [proposed intervenor's] interest compares with the interests of existing parties." *Arakaki*, 324 F.3d at 1086 (citations omitted). When an existing party and a proposed intervenor share the same ultimate objective, a presumption of adequacy of representation applies. *Id*. There is also an assumption of adequacy where, as here, the government is acting on behalf of a constituency that it represents. *United States v. City of Los Angeles*, 288 F.3d 391, 401 (9th Cir. 2002). In the absence of a "very compelling showing to the contrary, it will be presumed that a state adequately represents its citizens when the applicant shares the same interest." *Arakaki*, 324 F.3d at 1086 (internal quotation marks and citation omitted).

Despite their individual interests in the instant litigation, even "interpret[ing] the requirements broadly in favor of intervention," it is clear that the ultimate objective of both the Proposed Intervenors and Defendants is to defend the constitutionality of the Act. *Perry v. Proposition 8 Official Proponents*, 587 F.3d 947, 955 (9th Cir. 2009) (alteration in original) (quoting *Donnelly*, 159 F.3d at 409); *see also Prete*, 438 F.3d at 958–959 (holding that a public interest organization seeking intervention to defend a state constitutional ballot initiative failed to defeat the presumption of adequate representation when the ultimate objective of both the organization and the defendant government was to uphold the measure's validity).[9] Given this shared objective, the presumption of adequacy of representation applies, and the Proposed Intervenors must make "a very compelling showing" to defeat this presumption. *Arakaki*, 324 F.3d at 1086.

The Ninth Circuit has identified three factors for evaluating the adequacy of representation: (1) whether the interest of an existing party is such that it will undoubtedly make all of a proposed intervenor's arguments; (2) whether the existing party is capable and willing to make such arguments; and (3) whether a proposed intervenor would offer any necessary elements to the proceeding that existing parties would neglect. *Id*. "The prospective intervenor bears the burden of demonstrating that existing parties do not adequately represent its interests." *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 838 (9th Cir. 1996). However, this burden is satisfied if a proposed intervenor shows that

---

[9] In *Prete*, the Court explained that while "it is unclear whether this 'assumption' rises to the level of a second presumption, or rather is a circumstance that strengthens the first presumption, it is clear that 'in the absence of a very compelling showing to the contrary,' it will be presumed that the Oregon government adequately represents the interests of the intervenor-defendants." *Id*. at 957 (quoting *Arakaki*, 324 F.3d at 1086).

representation "may be" inadequate. *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n. 10 (1972)).

The Proposed Intervenors argue that their participation in this lawsuit is necessary because Defendants include "multiple agencies and voices of the Idaho government that represent multiple constituencies including constituencies with views and interests more aligned with Plaintiffs than proposed intervenors." Dkt. 30-1, at 10. The Proposed Intervenors also suggest they bring a unique perspective the government cannot adequately represent because the "personal distress and other negative effects suffered by female athletes from the inequity of authorized male competition against females is not felt by institutional administrators." *Id*. Neither of these arguments is convincing.

First, regardless of the "multiple constituencies" represented, or beliefs of individual constituents voiced before H.B. 500 was passed,[10] there is no reason to believe that Defendants cannot be "counted on to argue vehemently in favor of the constitutionality of [the Act]." *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1306 (9th Cir. 1997). Defendants' retention of an expert witness, "proactive filing of a motion to dismiss and the arguments they have advanced in support of that motion," and fervent opposition

---

[10] As Plaintiffs note, although Attorney General Wasden issued an opinion letter explaining that H.B. 500 was likely unconstitutional at the request of a legislator, Attorney General Wasden is statutorily required to represent the State in all courts, Idaho Code section 67-1401(1), and his Deputy Attorney General vigorously defended the Act in both briefing on the pending motions and during oral argument. As such, there is no evidence to suggest that Attorney General Wasden will not fulfill his statutory duties. In addition, the Proposed Intervenors contend BSU will not adequately represent their interests because BSU has a Gender Equality Center that advances the interests of transgender students. Dkt. 30-1, at 11–13. However, as Plaintiffs highlighted during oral argument, BSU could have realigned itself as a party if it felt it could not support the Act, but instead gave over representation to the State and has accordingly adopted the positions of the State. Dkt. 62, at 28: 10–15. The Proposed Intervenors' arguments regarding Attorney General Wasden and BSU are not a compelling showing of inadequate representation.

to Plaintiffs' Motion for a Preliminary Injunction, "suggest precisely the opposite conclusion." *Animal Legal Defense Fund v. Otter*, 300 F.R.D. 461, 465 (D. Idaho 2014). As even the Proposed Intervenors observe in their proposed opposition to Plaintiffs' Motion for Preliminary Injunction, the "legal authorities, standards, and arguments" in opposing Plaintiffs' motion for a preliminary injunction are "well covered" by Defendants. Dkt. 46, at 5.

Likewise, the Proposed Intervenors' "particular expertise in the subject of the dispute" as cisgender female athletes who have competed against a transgender woman athlete does not amount to a compelling showing of inadequate representation by Defendants. *Prete*, 438 F.3d at 958–959. To the extent they lack personal experience, Defendants can "acquire additional specialized knowledge through discovery (*e.g.*, by calling upon intervenor-defendants to supply evidence) or through the use of experts." *Id.* at 958. Defendants have also already referred to the experiences of both Madi and MK in opposing Plaintiffs' Motion for a Preliminary Injunction. Dkt. 41, at 19–20. Thus, the Proposed Intervenors' personal experience is insufficient to provide the showing necessary to overcome the presumption of adequate representation. *Prete*, 438 F.3d at 959.

However, the Court cannot find Defendants "will undoubtedly make" all of the Proposed' Intervenors' arguments. *Arakaki*, 324 F.3d at 1086. Specifically, there are two limiting constructions that Defendants could, and in fact have, advocated to support dismissal of Plaintiffs' suit and/or assuage constitutional doubts clouding the Act: (1) the Act is not self-executing and requires another individual to invoke the "dispute process" before any transgender athlete will be precluded from playing on a women's team; and (2)

to verify her sex, a transgender female athlete need only submit a form from her health care provider verifying that she is female. Defendants invoked such limiting constructions in their briefing on the Motion to Dismiss and reaffirmed them during oral argument. *See*, *e.g.*, Dkt. 40-1, at 3, 6–7; Dkt. 59, at 5–6; Dkt. 62, at 44:13–25, 66:21–25. Thus, that the "the government will offer . . . a limiting construction of [the Act] is not just a theoretical possibility; it has already done so." *Lockyer*, 450 F.3d at 444.

In contrast to Defendants' attempt to narrow the Act, the Proposed Intervenors suggest the Act must be read broadly to categorically preclude transgender women from ever playing on female sports teams, regardless of whether they become the target of a dispute or whether they can obtain a sex verification letter from a health care provider. These are far more than differences in litigation strategy between Defendants and the Proposed Intervenors. *City of Los Angeles*, 288 F.3d at 402–403 ("[M]ere differences in strategy . . . are not enough to justify intervention as of right."). This conflicting construction goes to the heart of interpretation and enforcement of the Act.

The Court therefore concludes that the Proposed Intervenors have "more narrow, parochial interests" than the Defendants. *Lockyer*, 450 F.3d at 445 (finding proposed intervenors overcame the presumption of adequacy of representation where the government suggested a limiting construction of a law in its motion for summary judgment); *Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 899 (9th Cir. 2011) (holding proposed intervenors overcame presumption of adequate representation where they sought to secure the broadest possible interpretation of the Forest Service's Interim Order, while the Forest Service argued that a much narrower

interpretation would suffice to comply with the Interim Order). Through the presentation of direct evidence that Defendants "will take a position that actually compromises (and potentially eviscerates) the protections of [the Act]," the Proposed Intervenors have overcome the presumption that Defendants will act in their interests. *Lockyer*, 450 F.3d at 445.

Liberally construing Rule 24(a), the Court finds that the Proposed Intervenors have met the test for intervention as a matter of right. Alternatively, however, the Court finds permissive intervention is also appropriate.

### b. Permissive Intervention

The Court's discretion to grant or deny permissive intervention is broad. *Spangler v. Pasadena City Bd. of Educ.*, 552 F.2d 1326, 1329 (9th Cir. 1977) (citation omitted). The Ninth Circuit has "often stated that permissive intervention requires: (1) an independent ground for jurisdiction; (2) a timely motion; and (3) a common question of law and fact between the movant's claim or defense and the main action." *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 843 (9th Cir. 2011) (citations omitted). "In exercising its discretion," the Court must also "consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). When a proposed intervenor has otherwise met the requirements, "[t]he court may also consider other factors in the exercise of its discretion, including the nature and extent of the intervenors' interest and whether the intervenors' interests are adequately represented by other parties." *Perry*, 587 F.3d at 955 (quoting *Spangler*, 552 F.2d at 1329).

Plaintiffs do not dispute that the Proposed Intervenors have an independent ground for jurisdiction and share a common question of law and fact with the defense of the main action. Plaintiffs instead argue that permissive intervention should be denied because existing parties adequately represent the Proposed Intervenors' interests, and because intervention would unduly delay or prejudice the adjudication of the rights of the original parties. Dkt. 45, at 16–19. As explained above, the Proposed Intervenors have shown Defendants may not adequately represent their interests because Defendants have advanced a limiting construction of the Act and thus *undoubtedly will not* make all of the arguments Madi and MK will make. *Arakaki*, 324 F.3d at 1086. The Court accordingly rejects Plaintiffs' contention that permissive intervention should be denied because Defendants adequately represent the Proposed Intervenors' interests.

Plaintiffs also argue the Proposed Intervenors' participation will likely delay and prejudice the adjudication of Plaintiffs' claims because Madi and MK waited six weeks after Plaintiffs filed their Complaint to seek intervention. This argument fails because the Ninth Circuit has held an application to intervene is timely where, as here, it is filed less than three months after the complaint. *See, e.g., Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1397 (9th Cir. 1995) (finding motion to intervene filed four months after initiation of a lawsuit to be timely); *Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011) (deeming motion to intervene timely when it was filed "less than three months after the complaint was filed and less than two weeks after [Defendant] filed its answer to the complaint.").

Plaintiffs next contend they will be prejudiced if they are unable to obtain a ruling from this Court before the fall sports season begins, and that the any disruption of the briefing schedule to accommodate the Motion to Intervene could delay resolution of Plaintiffs' request for emergency relief. This concern is moot because the Motion to Intervene was fully briefed prior to oral argument on July 22, 2020, and the Court is issuing the instant decision on all three pending motions before the fall sports season begins.

Finally, Plaintiffs argue intervention could prejudice the adjudication of their claims because counsel for the Proposed Intervenors have a history of utilizing misgendering tactics that will delay and impair efficient resolution of litigation. For instance, the Motion to Intervene is replete with references to Lindsay using masculine pronouns and refers to other transgender women by their former male names. The Court is concerned by this conduct, as other courts have denounced such misgendering as degrading, mean, and potentially mentally devastating to transgender individuals. *T.B., Jr. ex rel. T.B. v. Prince George's Cty. Bd. of Educ.*, 897 F.3d 566, 577 (4th Cir. 2018) (describing student's harassment of transgender female teacher by referring to her with male gender pronouns as "pure meanness."); *Hampton v. Baldwin*, 2018 WL 5830730, at *2 (S.D. Ill. Nov. 7, 2018) (referencing expert testimony that "misgendering transgender people can be degrading, humiliating, invalidating, and mentally devastating.").

Counsel for the Proposed Intervenors responds that they have used such terms not to be discourteous, but to differentiate between "immutable" categories of sex versus "experiential" categories of gender identity, and that the terms they use simply reflect "necessary accuracy." Dkt. 52, at 8 (quoting *Frontiero v. Richardson*, 411 U.S. 677, 686

(1973)). Such "accuracy," however, is not compromised by simply referring to Lindsay and other transgender females as "transgender women," or by adopting Lindsay's preferred gender pronouns.[11] *See, e.g., Edmo v. Corizon*, 935 F.3d 757 (9th Cir. 2019) (consistently referring to transgender female prisoner using her chosen name and female gender pronouns); *Canada v. Hall*, 2019 WL 1294660, at *1 n. 1 (N.D. Ill. March 21, 2019) ("Although immaterial to this ruling, the Court would be derelict if it failed to note the defendants' careless disrespect for the plaintiff's transgender identity, as reflected through . . . the consistent use of male pronouns to identify the plaintiff. The Court cautions counsel against maintaining a similar tone in future filings."); *Lynch v. Lewis*, 2014 WL 1813725, at *2 n. 2 (M.D. Ga. May 7, 2014) ("The Court and Defendants will use feminine pronouns to refer to the Plaintiff in filings with the Court. Such use is not to be taken as a factual or legal finding. The Court will grant Plaintiff's request as a matter of courtesy, and because it is the Court's practice to refer to litigants in the manner they prefer to be addressed when possible.").[12]

Ultimately, however, that the Proposed Intervenors' counsel used gratuitous language in their briefs is not a reason to deny Madi and MK the opportunity to intervene to support a law of which they are the intended beneficiaries. Moreover, during oral

---

[11] The Court does not take issue with identifying Lindsay (or any other transgender women) as a transgender woman or transgender female, a male-to-female transgender athlete or individual, or as a person whose sex assigned at birth (male) differs from her gender identity (female). *Edmo*, 935 F.3d at 772. Each of these descriptions makes counsel's point without doing so in an inflammatory and potentially harmful manner.

[12] Personal preferences or beliefs and organizational perceptions or positions notwithstanding, the Court expects courtesy between all parties in this litigation. In an ever contentious social and political world, the Courts will remain a haven for fairness, civility, and respect—even in disagreement.

argument, counsel for the Proposed Intervenors was respectful in advocating for Madi and MK without needlessly attempting to shame Lindsay or other transgender women. That counsel did so illustrates there is no need to misgender Lindsay or others in order to "speak coherently about the goals, justifications, and validity of the Fairness in Women's Sports Act." Dkt. 52, at 8. Counsel should continue this practice in future filings and arguments before the Court.

In sum, the Court will allow Madi and MK to intervene as of right, and, alternatively, finds permissive intervention is also appropriate. The Court will accordingly collectively refer to Madi and MK hereinafter as the "Intervenors."

### B. Motion to Dismiss (Dkt. 40)

Defendants filed a Motion to Dismiss Plaintiffs' action, contending Plaintiffs lack standing, that their claims are not ripe for review, and that their facial challenges fail as a matter of law.

#### 1. Legal Standard

A motion to dismiss based on a lack of Article III standing arises under Federal Rule of Civil Procedure 12(b)(1). *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011); *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 362–63 (1st Cir. 2001) (applying Rule 12(b)(1) to a motion to dismiss on grounds of ripeness or mootness). A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may challenge jurisdiction either on the face of the pleadings or by presenting extrinsic evidence for the court's consideration. *Safer Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (holding a jurisdictional attack may be facial or factual). "In a facial attack, the challenger asserts that the allegations

contained in the complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id*. Where, as here, an attack is facial, the court confines its inquiry to allegations in the complaint. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).

When ruling on a facial jurisdictional attack, courts must "accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party." *De La Cruz v. Tormey*, 582 F.2d 45, 62 (9th Cir. 1978) (citing *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). However, the plaintiff bears the burden of alleging facts that are legally sufficient to invoke the court's jurisdiction. *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

Rule 12(b)(6) permits a court to dismiss a case if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A Rule 12(b)(6) dismissal may be based on either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (citation omitted). In deciding whether to grant a motion to dismiss, the court must accept as true all well-pled factual allegations made in the pleading under attack. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court is not, however, "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). However, a "complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in

support of the claim that would entitle the plaintiff to relief." *Id.* (citing *Morley v. Walker*, 175 F.3d 756, 759 (9th Cir. 1999)).

Dismissal without leave to amend is inappropriate unless it is beyond doubt that the complaint could not be saved by amendment. *See Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009) (citations omitted). The Ninth Circuit has held that "in dismissals for failure to state a claim, a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss and Liehe, Inc. v. N. California Collection Serv., Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

    *2. Analysis*

    a. <u>Standing</u>

The "irreducible constitutional minimum" of Article III standing consists of three elements: (1) the plaintiff must have suffered an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant and not the result of the independent action of some third party not before the court; and (3) that is likely to be redressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To survive a Rule 12(b)(1) motion at the pleading stage (a facial challenge to subject-matter jurisdiction), the complaint must clearly allege facts demonstrating each element of standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

Defendants suggest Plaintiffs lack standing because they have failed to allege that they have suffered an injury in fact.[13] Dkt. 40-1, at 6. "To establish injury in fact, a plaintiff must show that he or she has suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). "A plaintiff threatened with future injury has standing to sue if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" *In re Zappos.com, Inc.*, 888 F.3d 1020, 1024 (9th Cir. 2018) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). A plaintiff cannot establish standing by alleging a threat of future harm based on a chain of speculative contingencies. *Nelsen v. King Cty.*, 895 F.2d 1248, 1252 (9th Cir. 1990).

Defendants argue Plaintiffs have not alleged an injury in fact because all alleged harms are conjectural, hypothetical, or based on a chain of speculative contingencies. Specifically, Defendants suggest that Lindsay's alleged harm of being subject to exclusion from participation on a women's sport teams, and Jane's alleged harm of being required to verify her sex, cannot occur unless each Plaintiff first makes a women's athletic team, and a third party then disputes either Plaintiffs' sex according to regulations that the State Board of Education has not yet promulgated.[14] Dkt. 40-1, at 6. This argument fails with respect to both Plaintiffs.

---

[13] Defendants do not challenge the causation and redressability elements of standing.

[14] Defendants also maintain that "because HB 500 has not yet come into effect, all alleged harm is future harm—and Plaintiffs have not shown that the alleged injuries are certainly impending, or that there is

**i. Lindsay**

The Act categorically bars Lindsay from participating on BSU's women's cross-country and track teams. Idaho Code § 33-6203(2) ("Athletic teams or sports designated for females, women, or girls *shall* not be open to students of the male sex.") (emphasis added). Although Defendants contend Lindsay will not be harmed unless she first makes the BSU team and someone then seeks to exclude her through a sex verification challenge, the Act prevents BSU from allowing Lindsay to try out for the women's team at all.

The Act also subjects BSU to a risk of civil suit by any student "who is deprived of an athletic opportunity or suffers any direct or indirect harm," if BSU allows a transgender woman to participate on its athletic teams. Idaho Code § 33-6205(1). A student who prevails on a claim brought pursuant to this section "shall be entitled to monetary damages, including for any psychological, emotional, and physical harm suffered, reasonable attorney's fees and costs, and any other appropriate relief." *Id.* at 6205(4). Defendants' claim that the Act's categorical bar against Lindsay's participation on BSU's women's teams is not "self-executing" because it "has no independent enforcement mechanism," is meritless in light of the risk of significant civil liability the Act imposes on any school that allows a transgender woman to participate in women's sports. Dkt. 59, at 5.

The harm Lindsay alleges—the inability to participate on women's teams—arose when the Act went into effect on July 1, 2020. That Lindsay has not yet tried out for BSU athletics or been subject to a dispute process is irrelevant because the Act bars her from

---

substantial risk of harm occurring." Dkt. 40-1, at 6. Since the Act went into effect July 1, 2020, this argument is moot.

trying out in the first place. The Supreme Court has long held that the "injury in fact" required for standing in equal protection cases is denial of equal treatment resulting from the imposition of a barrier, not the ultimate inability to obtain the benefit. *Ne. Florida Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 664 (1993) ("When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing"); *Clements v. Fashing*, 457 U.S. 957, 962 (1982) (finding political officers had standing to challenge provision of Texas Constitution requiring automatic resignation for some officeholders upon their announcement of candidacy for another office because injury was the "obstacle to [their] candidacy" for a new office, not the fact that they would have been elected to a new office but for the law's prohibition); *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 281 n. 14 (1978) (holding twice-rejected white male applicant had standing to challenge medical school's admissions program which reserved 16 of 100 places in the entering class for minority applicants, because the requisite "injury" was plaintiff's inability to *compete* for all 100 places in the class, simply because of his race, not that he would have been *admitted* in the absence of the special program). Lindsay has adequately alleged an injury because she cannot compete for a position on BSU's women's cross-country and track teams in the first place, regardless of whether or not she would ultimately make such

teams.[15]

In addition, even if BSU risked civil liability and allowed Lindsay to try out for, or join, a women's team, it is not speculative to suggest Lindsay's sex would be disputed. Lindsay is a nineteen-year-old transgender woman who has bravely become the public face of this litigation, and, in doing so, has captured the attention of local and national news. *See, e.g.*, James Dawson, *Idaho Transgender Athlete Law To Be Challenged in Federal Court*, https://www.boisestatepublicradio.org/post/idaho-transgender-athlete-law-be-challenged-federal-court#stream/0 (Apr. 15, 2020); Julie Kliegman, SPORTS ILLUSTRATED, *Idaho Banned Trans Athletes from Women's Sports. She's Fighting Back*, https://www.si.com/sports-illustrated/2020/06/30/idaho-transgender-ban-fighting-back (June 30, 2020); Roman Stubbs, THE WASHINGTON POST, *As transgender rights debate*

---

[15] Citing *Braunstein v. Arizona Dep't of Transp.*, 683 F.3d 1177, 1185 (9th Cir. 2012), Defendants argue that even where the government discriminates on the basis of a protected category, only those who are "personally denied equal treatment have a cognizable injury under Article III." Dkt. 59, at 3. In *Braunstein*, the Ninth Circuit considered a white male engineer's lawsuit alleging the Arizona Department of Transportation violated his right to equal protection by giving general contractors a financial incentive to hire minority-owned subcontractors. *Braunstein*, 683 F.3d at 1184. Braunstein alleged that these preferences prevented him, as a non-minority business owner, from competing for subcontracting work on an equal basis. *Id*. at 1185. However, Braunstein did not submit a quote or attempt to secure subcontract work from any of the prime contractors who bid on the government contract. *Id*. at 1185. The Ninth Circuit held that because Braunstein's surviving claim was for damages, rather than for declaratory and injunctive relief, Braunstein had to show more than that he was "able and ready" to seek subcontracting work. *Id*. at 1186. The Court determined Braunstein had not established an injury for purposes of his claim for damages because Braunstein had "done essentially nothing to demonstrate that he [was] in a position to compete equally with the other contractors." *Id*. By contrast, Lindsay seeks declaratory and injunctive relief, and has demonstrated she is "able and ready" to join the BSU cross-country and women's track teams. *Id*. at 1186 (citing *Gratz v. Bollinger*, 539 U.S. 244, 261–62 (2003) (holding plaintiff had standing to challenge university's race-conscious transfer admissions policy, even though he never applied as a transfer student, because he demonstrated that he was "able and ready to do so.") Lindsay has adequately alleged that she is ready and able to join  BSU's women's cross-country and women's track teams and also that she is in a position to compete with other students who try out for BSU's women's track and cross-country teams. Specifically, Lindsay alleges she has been training hard to qualify for such teams, that she is a life-long runner who competed on track and cross-country teams in high school, and that she will try out for the cross-country team in fall 2020 and track team in spring 2020 if BSU allows her to do so. Dkt. 1, at ¶¶ 6, 25, 33. Such allegations are sufficient to establish standing for Lindsay's claims. *Braunstein*, 683 F.3d at 1185–86.

*spills into sports, one runner finds herself at the center of a pivotal case* https://www.washingtonpost.com/sports/2020/07/27/idaho-transgender-sports-lawsuit-hecox-v-little-hb-500/ (July 27, 2020).[16]

In addition to such headlines, prominent athletes, including Billie Jean King and Megan Rapinoe, have, due to the Act, called for the NCAA to move men's basketball tournament games scheduled to be played in Idaho next March to another state. *Id*. On the other side of the coin, advocates in favor of the Act, including 300 high-profile female athletes, signed a letter asking the NCAA not to boycott Idaho over passing the Act. Ellie Reynolds, THE FEDERALIST, *More Than 300 Female Athletes, Olympians Urge NCAA to Protect Women's Sports*, https://thefederalist.com/2020/07/30/more-than-300-female-athletes-olympians-urge-ncaa-to-protect-womens-sports/ (July 30, 2020). In light of the extensive attention this case has already received, and widespread knowledge that Lindsay is transgender, it is untenable to suggest she would *not* be subject to a sex dispute if BSU allowed her the opportunity to try out for, or join, a women's team.[17]

Defendants also argue Lindsay lacks standing because she has not alleged facts to

---

[16] The Court takes judicial notice of such articles because they are matters in the public realm. "When a court takes judicial notice of publications like websites and newspaper article, the court merely notices what was in the public realm at the time, not whether the contents of those articles were in fact true." *Prime Healthcare Services, Inc. v. Humana Ins. Co*., 230 F. Supp. 3d 1194, 1201 (citing *Heliotrope Gen. Inc. v. Ford Motor Co*., 189 F.3d 971, 981 n. 118 (9th Cir. 1999)). The Court references such articles solely to illustrate that this case has received local and national attention, and not for the truth of the contents of the articles. *Id*.

[17] As mentioned, BSU cannot allow Lindsay this opportunity under section 33-6203(2) of the Act. Given BSU's awareness that Lindsay is a transgender woman, the Act directs that BSU "shall not" permit her to join the women's team, regardless of whether a third-party challenges Lindsay's sex. Idaho Code § 33-6203(2).

show she could compete under the current NCAA rules, such as dates showing she has undergone hormone treatment for one calendar year prior to participation on women's sports teams. However, Lindsay alleged in the Complaint that she is being treated with both testosterone suppression and estrogen, and that she is eligible to compete in women's sports in fall 2020 under existing NCAA rules for inclusion of transgender athletes. Dkt. 1, at ¶¶ 29, 32. Because the Court must accept such allegations as true and construe them in Lindsay's favor, Lindsay has adequately alleged she is eligible to participate on women's teams under the NCAA's regulations despite the Complaint's omission of the exact dates of her treatment. *De la Cruz*, 582 F.2d at 62.

Nonetheless, Defendants claim Lindsay has not adequately alleged she is otherwise eligible to play on women's teams because the U.S. Department of Education Office of Civil Rights ("OCR") recently issued a Letter of Impending Enforcement Action ("OCR Letter") opining that allowing transgender high school athletes in Connecticut to participate in women's sports violated the rights of female athletes under Title IX.[18] Dkt. 40-1, at 7 n. 1, 10 n. 2. However, the OCR Letter itself states that "it is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such." Dkt. 41, at 68. Because it is expressly not the OCR's formal policy and may not be cited or construed as such, the

---

[18] The OCR Letter was filed by the OCR in Connecticut court cases involving claims by three high school student-athletes and their parents due to the Connecticut Interscholastic Athletic Conference's policy of permitting transgender women to compete on women's teams. Dkt. 41, at 25. Although the parties do not raise the issue, the Court takes judicial notice of the OCR Letter, filed by Defendants in support of their Opposition to the Motion for Preliminary Injunction, and cited by Defendants in their Motion to Dismiss, because the Court may take judicial notice of "proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to the matters at issue." *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992).

OCR Letter does not render Lindsay ineligible from participating on women's teams. In addition, the OCR Letter is also of questionable validity given the Supreme Court's recent holding in *Bostock v. Clayton Cty.*, *Georgia*, 140 S. Ct. 1731, 1741 (2020) (clarifying that the prohibition on discrimination because of sex in Title VII includes discrimination based on an individual's transgender status); *see also Emeldi v. Univ. of Oregon*, 698 F.3d 715, 724 (9th Cir. 2012) (interpreting Title IX provisions in accordance with Title VII). The Court accordingly rejects Defendants' claim that Lindsay may not otherwise be eligible to play women's sports due to the OCR Letter.

Defendants also imply Lindsay cannot establish an injury in fact because the State Board of Education has not yet promulgated regulations governing third-party sex verification disputes. Dkt. 40-1, at 3, 6. Regardless of how they are written, any future regulations cannot alter the Act's categorical bar against transgender women participating on women's teams. Under the Act, women's teams "shall not be open to students of the male sex." *Id*. at § 33-6203(2). Future regulations could not alter this mandate without eliminating a key component of the Act by overriding specific language of the statute.

In essence, Defendants' argument regarding Lindsay's standing is essentially a claim that Lindsay has not suffered any injury because there is no guarantee the Act will be enforced. Defendants have not identified any "principal of standing," or "any case that stands for the proposition that [the Court] should deny standing on the assumption that the regulated entity under the statute will simply violate the law and not do what the law says." Dkt. 62, at 52:5–9. In fact, the Supreme Court rejected a similar argument by the State of Georgia in *Turner v. Fouche*, 396 U.S. 346, 361 (1970). In *Turner*, the Supreme Court held

a non-property owner had standing to raise an, equal protection claim against a state law requiring members of the board of education to be property owners. The Court addressed Georgia's contention that the non-property owner lacked standing to challenge the law in the absence of evidence that the law had been enforced, noting: "Georgia also argues the question is not properly before us because the record is devoid of evidence that [the property ownership requirement] has operated to exclude any [non-property owners] from the Taliaferro County board of education." *Id.* at 361 n. 23. The *Turner* Court neatly rejected this contention, stating, "Georgia can hardly urge that her county officials may be depended on to ignore a provision of state law." *Id.* Moreover, given the civil liability and significant damages any regulated entity in Idaho now faces if they allow a transgender woman to participate on woman's sport teams, the Act's enforcement is essentially guaranteed. Idaho Code § 33-6205.

In addition to the injury of being barred from playing women's sports, Lindsay also claims an injury of being forced to turn over private medical information to the government if her sex was challenged. Dkt. 1, at ¶¶ 157, 168. Defendants argue this injury is "not based in [the Act's] text, which requires a 'health examination and consent form or other statement signed by the student's personal health provider' when there is a dispute, and does not require that the health care provider expound further or disclose any underlying health information." Dkt. 40-1, at 8. However, if BSU violates the Act by allowing Lindsay to participate in women's sports and another student challenges Lindsay's sex, the Act also provides a health care provider can verify Lindsay's sex relying *only* on one or more of the following: her reproductive anatomy, genetic makeup, or normal endogenously produced

testosterone levels. Idaho Code § 33-6203(3). Evaluating any of these criteria would require invasive examination and/or testing and would also necessarily reveal extremely personal health information such as Lindsay's precise genetic makeup. Moreover, it would be impossible for Lindsay to demonstrate a "biological sex" permitting participation on a women's team based on any of these three criteria. Dkt. 55, at 7–8.

Defendants counter that Plaintiffs' concerns are overblown and that the verification process is not an invasive as Plaintiffs make it out to be. They suggest a health care provider may verify a student's "biological sex" based on something other than the three expressly listed criteria due to the "health examination and consent form or other statement provision" language outlined in the Act. Dkt. 40-1, at 3 (claiming that the Act does not require the health care provider "to use the three specified factors in providing an 'other statement' verifying 'the students biological sex.'") During oral argument, defense counsel confirmed that Lindsay can play on female sport's teams if her health care provider simply signs an "other statement" stating that Lindsay is female. Dkt. 62, at 66:21-25; 67:4–9.

It is "a cardinal principle of statutory construction" that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (internal quotation marks and citations omitted); *United States v. Menasche*, 348 U.S. 528, 538–539 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute." (internal quotation marks omitted); *Beck v. Prupis*, 529 U.S. 494, 506 (2000) (it is a "longstanding canon of statutory construction that terms in a statute should not be construed so as to render any provision of that statute meaningless or superfluous.")

If the Court were to adopt Defendants' aforementioned construction of the statute, the entire legislative findings and purpose section of the Act would be rendered meaningless. Idaho Code § 33-6202 (explaining inherent physiological differences put males at an advantage in sports, requiring sex-specific women's teams to promote sex equality). So too would the Act's mandate that athletic teams or sports designated for females, women, or girls "shall not be open to students of the male sex." *Id.* at § 33-6203(2). Defendants' contention that Lindsay would not be subject to the invasive and potentially cost-prohibitive medical examination codified in Idaho Code section 33-6203(3) because her health care provider could simply verify that she is female is impossible to reconcile with the rest of the Act's provisions.[19] As such, Lindsay has also alleged a non-speculative risk of suffering an invasion of privacy if BSU violated the law and allowed her to try out for the women's cross-country or track team.

### ii. Jane

Jane has also alleged an injury in fact because, by virtue of the Act's passage, she is now subject to disparate, and less favorable, treatment based on sex. As a female student athlete, Jane risks being subject to the "dispute process," a potentially invasive and expensive medical exam, loss of privacy, and the embarrassment of having her sex challenged, while male student athletes who play on male teams do not face such risks. The Supreme Court has long recognized that unequal treatment because of gender like that

---

[19] During oral argument, Plaintiffs' counsel stated that they would be happy to consider entering into a consent decree if Defendants were willing to agree that this interpretation of the statute was authoritative and binding in Idaho. Dkt. 62, at 70:16–21. Defendants did not respond to this suggestion, and the parties have not notified the Court of any subsequent talks regarding a potential consent decree.

codified by the Act "is an injury in fact" sufficient to convey standing. *Heckler v. Mathews*, 465 U.S. 728, 738 (1984) (finding plaintiff claimed a judicially cognizable injury where a statute subjected him to unequal treatment solely because of his gender); *Davis v. Guam*, 785 F.3d 1311, 1315 (9th Cir. 2015) ("[Plaintiff's] allegation—that Guam law provides a benefit to a class of persons that it denies him—is 'a type of personal injury [the Supreme Court] has long recognized as judicially cognizable.'") (quoting *Heckler*, 465 U.S. at 738).

The male appellee in *Heckler* challenged a provision of the Social Security Act that required certain male workers (but not female workers) to make a showing of dependency as a condition for receiving full spousal benefits. *Heckler*, 465 U.S. at 731–35. However, the statute also "prevent[ed] a court from redressing this inequality by increasing the benefits payable to" male workers. *Id*. at 739. Thus, the lawsuit couldn't have resulted in any tangible benefit to plaintiff. The Supreme Court nevertheless held that appellee's claimed injury of being subject to unequal treatment solely because of his gender was "a type of personal injury we have long recognized as judicially cognizable." *Id*. at 738. The *Heckler* Court explained plaintiff had standing to challenge the provision because he sought to vindicate the "right to equal treatment," which isn't necessarily "coextensive with any substantive rights to the benefits denied the party discriminated against." *Id*. at 739. In *Davis*, the Ninth Circuit read *Heckler* "as holding that equal treatment under law is a judicially cognizable inquiry that satisfies the case or controversy requirement of Article III, even if it brings no tangible benefit to the party asserting it." *Davis*, 785 F.3d at 1315.

As a cisgender girl who plays on the Boise High soccer team and who will run track on the girl's team in the spring, Jane is subject to worse and differential treatment than are

similarly situated male students who play for boy's teams in Idaho.[20] Jane has suffered an injury because she is subject to disparate rules for participation on girls' teams, while boys can play on boys' teams without such rules. *Id*. (holding Guam's alleged denial of equal treatment on the basis of race through voter registration law was a judicially cognizable injury); *see also Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012) (holding that Latino plaintiffs had standing to challenge policy targeting Latinos in connection with traffic stops based on their "[e]xposure to this policy while going about [their] daily li[ves]," even though "the likelihood of a future stop of a particular individual plaintiff may not be 'high'") (citation omitted).[21] That Jane has not had her sex challenged does not change the fact that she is subject to different, and less favorable, rules for participation on girls' teams that similarly situated boys are not.

In addition to being subject to disparate treatment on the basis of her sex, Jane reasonably fears that her sex will be disputed and that she will suffer the further injury of having to undergo the sex verification process. Dkt. 1, ¶¶ 46–50. In *Krottner v. Starbucks*

[20] The Court uses the specific terms "girl" and "girl's teams" for Jane, and "transgender woman" and "woman's teams" for Lindsay, due to their respective ages and year in school. The terms are generally interchangeable, however, since the Act applies to nearly all girls and women student athletes in Idaho. Idaho Code § 33-6203(1).

[21] Defendants suggest *Melendres* is inapposite because each of the plaintiffs in *Melendres* had been subjected to targeted traffic stops, and because plaintiffs presented evidence that the defendants had an ongoing policy of targeting Latinos. Dkt. 59, at 2–3 n. 1. Defendants argue this case is distinguishable because no one has challenged either Plaintiff's sex, and because Defendants have no policy or practice to mount such challenges in the future. *Id*. This argument ignores that regulated entities, such as BSU and Boise High, are statutorily required to ensure that transgender women or girls do not play on female sports' teams, are also responsible for resolving sex disputes, and risk significant civil liability if they fail to comply with the statute. Idaho Code §§ 33-6203(3), 6205. The requirements the statute itself places on regulated entities is evidence that the policy will be enforced.

*Corp.*, 628 F.3d 1139 (9th Cir. 2010), the Ninth Circuit addressed the Article III standing of victims of data theft where a thief stole a laptop containing "the unencrypted names, addresses, and social security numbers of approximately 97,000 Starbucks employees." *Id*. at 1140. Some employees sued, and the only harm that most alleged was an "increased risk of future identity theft." *Id*. at 1142. There was no evidence that the thief had actually used plaintiffs' specific identities. The Ninth Circuit determined this was sufficient for Article III standing, holding that the plaintiffs had "alleged a credible threat of real and immediate harm" because the laptop and their personal information had been stolen. *Id*. at 1143.

Jane also alleges a credible threat of being forced to undergo a sex verification process. Jane has identified why she is more likely than other female athletes to be subjected to the dispute process. Specifically, Jane "worries that one of her competitors may decide to 'dispute' her sex" because she "does not commonly wear skirts or dresses," "most of her closest friends are boys," she has "an athletic build," and because "people sometimes think of her as masculine." Dkt. 1, at ¶¶ 46–47. Further, even in the absence of Jane's specific characteristics, her general fear of being subjected to the dispute is credible because the Act currently provides that essentially anyone can challenge another female athlete's sex and protects any challenger from adverse action regardless of whether the dispute is brought in good faith or simply to bully or harass. Although, as Defendants note, the State Board of Education may promulgate regulations that narrow the Act's dispute process, Jane risks being subject to the currently unlimited process as soon as she tries out for Boise High's soccer team on or around August 17, 2020.

Under the Act's dispute process, Jane may have to verify that she is female in order to play girls' sports, and, given the clear meaning of the statute, such verification must be based on her reproductive anatomy, genetic makeup, or normal endogenously produced testosterone levels. Idaho Code § 33-6203(3). As discussed above, Defendants' claim that Jane can simply provide a health examination and consent form from her sports physical, or "other statement" from her personal health care provider, appears impossible to reconcile with the clear language of the Act. Dkt. 40-1, at 7. Jane's risk of being forced to undergo an invasion of privacy simply to play sports represents an "injury in fact" sufficient to confer standing. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) ("A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement. But one does not have to await the consummation of threatened injury to obtain preventive relief.") (internal quotation marks, alterations, and citations omitted).

Because it finds both Lindsay and Jane have alleged an injury in fact, the Court turns to Defendants' ripeness argument.

b. Ripeness[22]

Defendants also seek dismissal because this case is purportedly unripe. Ripeness is a question of timing. *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000). It is a doctrine "designed to prevent the courts, through avoidance of

---

[22] Standing and ripeness are closely related. *Colwell v. Dep't of Health and Human Services*, 558 F.3d 1112, 1123 (9th Cir. 2009). "But whereas standing is primarily concerned with *who* is a proper party to litigate a particular matter, ripeness addresses *when* that litigation may occur." (emphasis in original) (internal quotation marks and citations omitted).

premature adjudication, from entangling themselves in abstract disagreements." *Id.* (internal quotation marks and citation omitted).

The "ripeness inquiry contains both a constitutional and prudential component." *Portman v. Cty. of Santa Clara*, 995 F.2d 898, 902 (9th Cir. 1993). As Defendants acknowledge, the constitutional component of the ripeness injury is generally coextensive with the injury element of standing analysis. Dkt. 40-1, at 9; *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 n. 2 (9th Cir. 2003) (noting, "the constitutional component of ripeness is synonymous with the injury-in-fact prong of the standing inquiry"); *see also Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 81 (1978) (finding that an "injury in fact" satisfies the constitutional ripeness inquiry). Defendants' constitutional ripeness arguments fail for the same reasons that their standing arguments fail.

The prudential component of ripeness "focuses on whether there is an adequate record upon which to base effective review." *Portman*, 995 F.2d at 903. In evaluating prudential ripeness, the Court must consider "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Thomas*, 220 F.3d at 1141. Ultimately, prudential considerations of ripeness are discretionary. *Id.* at 1142.

### i. Fitness for Judicial Review

The Supreme Court and Ninth Circuit have recognized the difficulty of deciding constitutional questions without the necessary factual context. *See, e.g.*, *W.E.B. DuBois Clubs of Am. v. Clark*, 389 U.S. 309, 313 (1967); *Thomas*, 220 F.3d at 1141. In *Thomas*, several landlords challenged an Alaska statute that banned discrimination on the basis of

marital status, arguing the statute violated their First Amendment rights. 220 F.3d at 1137. For instance, the landlords claimed, *inter alia*, that the City's prohibition on any advertising referencing a marital status preference violated their right to free speech. The Ninth Circuit found the free speech claim was not ripe because no "concrete factual scenario" demonstrated how the law, as applied, infringed the landlords' constitutional rights. *Id*. at 1141. Specifically, the landlords had never advertised or published a reference to marital status preference in the past in connection with their rental real estate activities, nor had expressed any intent of doing so in the future. *Id*. at 1140 n. 5. On this record, the Ninth Circuit held the alleged free speech violation did not rise to the level of a justiciable controversy. *Id*.

Here, unlike in *Thomas*, Plaintiffs' claims are concrete and Plaintiffs clearly delineate how the Act harms them in their specific circumstances. Specifically, Jane is a life-long student athlete who will try out for Boise High School's girls' soccer team in August 2020. Because of various identified traits that have led others to classify her as masculine, Jane reasonably fears she may be subject to a sex dispute challenge. That a specific individual has not threatened such challenge is immaterial because the Act has never been in effect during a school sport's season and the sex dispute challenge has thus never before been available, and, by virtue of being a female student athlete, Jane risks being subject to a sex dispute challenge as soon as she tries out for Boise High's girls' soccer team. Lindsay is also a life-long athlete who has alleged a desire and intent to try out for BSU's women's cross-country team this fall. If BSU permitted her to try out, Lindsay would meet the rules under the NCAA, and the rules in Idaho prior to the Act's

passage, to participate by the time BSU will have its first NCAA meet. However, Lindsay is now categorically barred from trying out for the cross-country team under the Act.

Defendants have not addressed such as-applied challenges and have not identified any factual questions that preclude consideration of such challenges at this juncture.[23]

Further, legal questions that require little factual development are more likely to be ripe. *Thomas v. Union Carbide Agric. Products Co*., 473 U.S. 568, 581 (1985). The issues Lindsay and Jane raise are primarily legal: whether the Act violates the Constitution and Title IX in light of its categorical exclusion of transgender women and girls from school sports and its sex-verification scheme for all female student athletes. As such, the Act's legality involves a "pure question of law" and Plaintiffs claims are fit for judicial review now. *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1435 (9th Cir. 1996) (finding claims were ripe and issue was purely legal where organization which arranged trips to Cuba challenged regulation restraining right to travel to Cuba, even though organization had not applied for, and had not been denied, the specific license required under regulation).

### ii. Hardship to the Parties should the Court Withhold Consideration

When a plaintiff challenges a statute or regulation, hardship is more likely if the

---

[23] Although Defendants again highlight that the Department of Education has not yet established the rules and regulations applicable to the sex verification process, Defendants do not articulate how the forthcoming rules and regulations could possibly change the Act's core prohibitions and requirements; could allow transgender women athletes to participate on women's teams; could exempt a girl or woman whose sex is disputed from the verification process; or could add to the narrow list of criteria that can be used to verify a girl's or woman's biological sex. Defendants are simply mistaken that impending regulations could possibly alleviate Plaintiffs' concerns, or that such rules must be established before Lindsay can be excluded from women's sports and before Jane can be subjected to a sex verification challenge.

statute has a direct effect on the plaintiff's daily life. *Texas v. United States*, 523 U.S.296, 301 (1998). Hardship is less likely if the statute's effect is abstract. *Id*. at 302 (rejecting argument that ongoing "threat to federalism" could constitute hardship).

Here, the Court is satisfied that the Plaintiffs stand to suffer a hardship should the Court withhold its decision. If the Court declines jurisdiction over this dispute, Lindsay will be categorically barred from participating on BSU's women's teams this fall and will also lose at least a season of NCAA eligibility, which she can never get back. Dkt. 1, at ¶ 34. Similarly, as soon as she tries out for fall soccer, Jane is subject to disparate rules and risks facing a sex verification challenge. If the Court withholds its decision, both Plaintiffs risk being forced to endure a humiliating dispute process and/or invasive medical examination simply to play sports.[24] Given the reasonable threat that the Act will be enforced within days of this decision, as well as the hardship such enforcement will impose on Lindsay and Jane, the Court exercises its discretion to accept jurisdiction over this dispute.

   c.   <u>Facial Challenge</u>[25]

---

[24] Lindsay will not have even this choice unless BSU violates the Act, exposing itself to civil suit, and allows her to join the women's team.

[25] "Facial and as-applied challenges do not enjoy a neat demarcation, but conventional wisdom defines facial challenges as 'ones seeking to have a statute declared unconstitutional in all possible applications,' while as-applied challenges are 'treated as the residual, although ostensibly preferred and larger, category.'" *Standing--Facial Versus As Applied Challenges--City of Los Angeles v. Patel*, 129 HARV. L. REV. 241, 246 (2015)("*Facial Versus As Applied Challenges*") (quoting Richard H. Fallon, Jr., *Fact and Fiction About Facial Challenges*, 99 CAL. L. REV. 915, 923 (2011)). However, as many scholars note, the distinction, if any, between a facial and an as-applied challenge is difficult to explain because there is a disconnect between what the Supreme Court has outlined and what happens in actual practice. *Facial Versus As Applied Challenges*, 129 HARV. L. REV. at 247; *see also* Gillian E. Metzger, *Facial Challenges and Federalism*, 105 COLUM. L. REV. 873, 882 (2005).

Finally, Defendants argue Plaintiffs' facial challenges fail as a matter of law because the Act's provisions can be constitutionally applied. Facial challenges are "disfavored" because they: (1) "raise the risk of premature interpretation of statutes on factually barebone records;" (2) run contrary "to the fundamental principle of judicial restraint"; and (3) "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 451 (2008) (internal quotation marks and citations omitted). As such, the Supreme Court has held, a "facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that *no set of circumstances* exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987) (emphasis added). As previously discussed, the Ninth Circuit has held that an Arizona policy of excluding boys from playing on girls' sports teams was constitutionally permissible. *Clark*, 659 F.2d at 1131. Thus, Defendants argue the Act can clearly be constitutionally applied to cisgender boys, and Plaintiffs' facial challenges fail.

Plaintiffs counter that the *Salerno* language does not represent the Supreme Court's standard for adjudicating facial challenges. Dkt. 55, at 17 (citing *City of Chicago v. Morales*, 527 U.S. 41, 51–52, 55 n. 22 (1999) (plurality) (finding an ordinance was facially invalid even though it also had constitutional applications and observing that, "[t]o the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court, including *Salerno* itself."). As Plaintiffs point out, *Salerno's* "no set of circumstances" test

was called into question by the Supreme Court in *Morales* and has been the subject of

considerable debate. *Morales*, 527 U.S. at 55 n. 22; *see also Janklow v. Planned*

*Parenthood, Sioux Falls Clinic*, 517 U.S. 1174, 1175 (1996) (stating that the "dicta in

*Salerno* does not accurately characterize the standard for deciding facial challenges[.]");

*Washington State Grange*, 552 U.S. at 449 (noting that some Members of the Supreme

Court have criticized the *Salerno* formulation); *Almerico v. Denney*, 378 F. Supp. 3d 920,

924–926 (D. Idaho 2019) (outlining debate regarding viability of *Salerno's* "no set of

circumstances" test); *Does 1-134 v. Wasden*, 2018 WL 2275220, at *4 (D. Idaho May 17,

2018) (noting the ongoing debate regarding *Salerno* and "what types of constitutional

claims would warrant a facial challenge, when a facial challenge becomes ripe, and the

level of scrutiny that should be applied to the challenged statute").

Notwithstanding such controversy, the Ninth Circuit has consistently held that

*Salerno* is the appropriate test for most facial challenges.[26] *S.D. Myers, Inc. v. City & Cty.*

*of San Francisco*, 253 F.3d 461, 467 (9th Cir. 2001) (explaining that the Ninth Circuit will

not reject *Salerno* in contexts other than the First Amendment or abortion "until the

majority of the Supreme Court clearly directs us to do so."); *Almerico*, 378 F. Supp. 3d at

925 ("Time and again, plaintiffs have attempted to escape the effect of the *Salerno*

standard, only to see their path foreclosed by the Ninth Circuit."). The Supreme Court also

continues to apply *Salerno* to most facial challenges, albeit with some limited exceptions.

---

[26] Exceptions to *Salerno's* "no set of circumstances" test have been developed but are not applicable here. For instance, *Salerno* does not apply to certain facial challenges to statutes under the First Amendment. *Planned Parenthood of S. Arizona v. Lawall*, 180 F.3d 1022, 1026 (9th Cir. 1999). The Supreme Court also held *Salerno's* "no set of circumstances" test does not apply to "undue burden" challenges to statutes regulating abortion in *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 895 (1992).

*See, e.g., Washington State Grange*, 552 U.S. at 449 (holding a plaintiff can succeed on a facial challenge only by establishing that no set of circumstances exists under which the law could be valid).

However, Plaintiffs suggest an exception to the *Salerno* test, recently applied by the Supreme Court in *City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015), is applicable. In *Patel*, the Supreme Court cited *Salerno* with approval, but also explained that when assessing whether a statute meets the "no set of circumstances" standard, the Supreme Court "has considered only applications of the statute in which it actually authorizes or prohibits conduct." *Id*. In addressing a facial challenge to a statute authorizing warrantless searches, the *Patel* Court held the "proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Id*. (quoting *Casey*, 505 U.S. at 894). Plaintiffs argue a facial challenge is appropriate here because transgender and cisgender girls and women, are those for "whom the law is a restriction," while the Act is "irrelevant" to cisgender boys. Dkt. 55, at 18 (quoting *Patel*, 576 U.S. at 418).

While the Court recognizes *Patel* implied that the "method for defining the relevant population" test may apply to all facial challenges, *Patel* unfortunately did not explain when such test is applicable, whether it is appropriate in contexts other than abortion or the Fourth Amendment, or how to distinguish those cases where the test is appropriately used for facial adjudication from others where it is not. Nothing in the *Patel* opinion "even explains why *Casey's* method of defining the relevant population to which a statute applies should be transplanted to adjudicate Fourth Amendment unreasonableness claims,

MEMORANDUM DECISION AND ORDER - 52

especially when *Casey* was confined to the abortion context before *Patel*." *Facial Versus As Applied Challenges*, 129 HARV. L. REV. at 250. Plaintiffs do not cite, and the Court has not located, any subsequent Ninth Circuit or Supreme Court case where *Patel's* method for defining the relevant population has been used outside the abortion or Fourth Amendment context. Absent such guidance, the Court declines to extend *Patel* to create a new exception to *Salerno's* "no set of circumstances test" here.

Plaintiffs also suggest that a motion to dismiss is not the proper vehicle for Defendants' opposition to their facial challenge, as the distinction between facial and as-applied challenges "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). However, *Citizens United* involved a facial challenge to a federal statute which purportedly violated plaintiffs' First Amendment rights. As noted *supra*, note 26, *Salerno* does not apply to facial challenges under the First Amendment. *Lawall*, 180 F.3d at 1026. As such, *Citizens United* appears inapplicable to cases where, as here, Plaintiffs facial challenges do not involve the First Amendment.

Further, the District of Idaho has frequently dismissed facial challenges at the Motion to Dismiss stage under *Salerno*, including facial challenges brought under the Fourteenth Amendment. *See, e.g.*, *Almerico*, 378 F. Supp. 3d at 926 (dismissing facial due process and equal protection challenge to Idaho statute requiring any healthcare directive executed by women in Idaho to contain provision rendering directive without force during pregnancy); *Williams v. McKay*, 2020 WL 1105087, at *5 (D. Idaho March 6, 2020) (dismissing prisoner's facial First Amendment challenge to prison's grievance policy);

*Wasden*, 2018 WL 2275220 at *18 (dismissing all facial constitutional challenges to Idaho's Sexual Offender Registration and Community Right-to-Know Act).

In sum, the Court is not convinced an exception to *Salerno* applies to Plaintiffs' facial Fourteenth Amendment challenges and will dismiss such claims. The Court will not dismiss Plaintiffs' as-applied Fourteenth Amendment challenges to the Act.[27]

### C.    Motion for Preliminary Injunction (Dkt. 22)

*1.  Legal Standard*

Injunctive relief "is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurack v. Armstrong*, 520 U.S. 968, 972 (1997)). A party seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) likely irreparable harm in the absence of a preliminary injunction; (3) that the balance of equities weighs in favor of an injunction; and (4) that an injunction is in the public interest. *Id*. at 20. Where, as here, "the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nkhen v. Holder*, 556 U.S. 418, 436 (2009)).

---

[27] Plaintiffs also bring facial challenges under the Fourth Amendment. Given the confusion created by *Patel* and uncertainty as to whether *Patel* applies here, the Court will deny dismissal of Plaintiffs' facial Fourth Amendment challenges without prejudice. However, even if the Court later determines that all of Plaintiffs' facial challenges fail, the Court rejects Defendants' suggestion that if the Court dismisses all facial challenges, all of Plaintiffs' other requests for relief, including all requests for injunctive relief, should be dismissed. Dkt. 59, at 8. Plaintiffs seek preliminary and permanent injunctive relief enjoining enforcement of the Act both facially and as applied. Dkt. 1, at 53 (Prayer for Relief, paragraph D, requesting injunctive relief "as discussed above" which includes reference to Plaintiffs' as-applied challenges in paragraphs A and B). Dismissal of Plaintiffs' facial challenges does not require dismissal of their requests for injunctive relief.

A preliminary injunction can take two forms. A prohibitory injunction prohibits a party from taking action and "preserve[s] the status quo pending a determination of the action on the merits." *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988). A mandatory injunction "orders a responsible party to take action." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996). A mandatory injunction "'goes well beyond simply maintaining the status quo,'" requires a heightened burden of proof, and is "'particularly disfavored.'" *Marlyn Nutraceuticals, Inc. v. MucosPharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (quoting *Anderson v. U.S.*, 612 F.2d 1112, 1114 (9th Cir. 1980)). In general, mandatory injunctions "'are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages.'" *Id.* (quoting *Anderson*, 612 F.2d at 111).

While the parties do not address the issue, the relevant "status quo" for purposes of an injunction "refers to the legally relevant relationship between the parties before the controversy arose." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014) (emphasis in original); *see also Regents of Univ. of California v. Am. Broad. Companies, Inc.*, 747 F.2d 511, 514 (9th Cir. 1984) (for purposes of injunctive relief, the status quo means "the last uncontested status which preceded the pending controversy") (internal quotation marks and citation omitted). Here, Plaintiffs' motion for preliminary injunction was filed to contest the enforceability of H.B. 500—Idaho's new Act. The status quo, therefore, is the policy in Idaho prior to H.B.500's enactment. Injunctions that prohibit enforcement of a new law or policy are prohibitory, not mandatory. *Arizona Dream Act*, 757 F.3d at 1061; *Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179

F.3d 725, 732 n. 13 (9th Cir. 1999) (requested preliminary injunction against enforcement of new zoning ordinance was not subject to heightened burden of proof since relief sought was prohibitory injunction that preserved the status quo pending a decision on the merits). Thus, if the Court grants Plaintiffs' preliminary injunction, it will be issuing a prohibitory injunction to preserve the status quo pending trial on the merits, rather than forcing Defendants to take action.

### 2. Analysis

#### a. Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment requires that all similarly situated people be treated alike. *City of Cleburne Living Ctr., Inc*., 473 U.S. 432, 439 (1985). Equal protection requirements restrict state legislative action that is inconsistent with core constitutional guarantees, such as equality in treatment. *Obergefell v. Hodges*, 135 S. Ct. 2584, 2603 (2015). However, the Fourteenth Amendment's "promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer v. Evans*, 517 U.S. 620, 631 (1996). The Supreme Court has attempted to reconcile this reality with the equal protection principle by developing tiers of judicial scrutiny. *Latta v. Otter*, 19 F. Supp. 3d 1054, 1073 (D. Idaho) ("*Latta I*"), *aff'd*, *Latta v. Otter*, 771 F.3d 456 (9th Cir. 2014) ("*Latta II*"). "The level of scrutiny depends on the characteristics of the disadvantaged group or the rights implicated by the classification." *Latta I*, 19 F. Supp. 3d at 1073.

When a state restricts an individual's access to a fundamental right, the policy must withstand strict scrutiny, which requires that the government action serves a compelling purpose and that it is the least restrictive means of doing so. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16-17 (1973). The Supreme Court has recognized that the Constitution protects a number of fundamental rights, including the right to privacy concerning consensual sexual activity, *Lawrence v. Texas*, 539 U.S. 558, 578 (2003), the right to marriage, *Obergefell*, 135 S. Ct. at 2599, and the right to reproductive autonomy, *Eisenstadt v. Baird*, 405 U.S. 438, 455 (1972). Access to interscholastic sports is not, however, a constitutionally recognized fundamental right. *See, e.g, Walsh v. La. High Sch. Athletic Ass'n*, 616 F.2d 152, 159–60 (5th Cir. 1980) (explaining that a student's interest in playing sports "amounts to a mere expectation rather than a constitutionally protected claim of entitlement[.]").

When a fundamental right is not at stake, a court must analyze whether the government policy discriminates against a suspect class. *Cleburne*, 473 U.S. at 440 (identifying race, alienage, and national origin as suspect classifications vulnerable to pernicious discrimination). Because government policies that discriminate on the basis of race or national origin typically reflect prejudice, such policies will survive only if the law survives strict scrutiny. *Id*. Strict scrutiny review is so exacting that most laws subjected to this standard fail, leading one former Supreme Court Justice to quip that strict scrutiny review is "strict in theory, but fatal in fact." *Fullilove v. Klutznick*, 448 U.S. 448, 519 (1980).

Statutes that discriminate on the basis of sex, a "quasi-suspect" classification, need

to withstand the slightly less stringent standard of "heightened" scrutiny.[28] *Craig v. Boren*, 429 U.S. 190, 197 (1976); *United States v. Virginia*, 518 U.S. 515, 533 (1996) ("*VMI*"). To withstand heightened scrutiny, classification by sex "must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig*, 429 U.S. at 197. "The purpose of this heightened level of scrutiny is to ensure quasi-suspect classifications do not perpetuate unfounded stereotypes or second-class treatment." *Latta I*, 19 F. Supp. 3d at 1073 (citing *VMI*, 518 U.S. at 533).

The District of Idaho determined transgender individuals qualify as a quasi-suspect class in *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1143–1145 (2018) ("*Barron*").[29] While not specifically stating that transgender individuals constitute a quasi-suspect class, the Ninth Circuit has also held that heightened scrutiny applies if a law or policy treats transgender persons in a less favorable way than all others. *Karnoski v. Trump*, 926 F.3d 1180, 1201 (2019). Further, although in the context of Title VII, the Supreme Court has, as mentioned, recently stated, "it is impossible to discriminate against a person for being . . . transgender

---

[28] Heightened scrutiny is also referred to as "intermediate scrutiny." *See, e.g., Clark v. Jeter*, 486 U.S. 456, 461 (1988). The Court uses the term "heightened" scrutiny for consistency.

[29] As the *Barron* Court explained, the Supreme Court employs a four-factor test to determine whether a class qualifies as suspect or quasi-suspect: (1) when the class has been "historically subjected to discrimination;" (2) has a defining characteristic bearing no "relation to ability to perform or contribute to society;" (3) has "obvious, immutable, or distinguishing characteristics;"" and (4) is "a minority or is politically powerless." *Id*. at 1144 (quoting *United States v. Windsor*, 570 U.S. 744 (2003)). The *Barron* Court determined transgender individuals meet each of these criteria. *Id*. This test has also been employed by district courts in other states to find transgender people as a quasi-suspect class. For instance, in *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y.), the court determined: (1) transgender individuals have a history of persecution and discrimination and, moreover, "this history of persecution and discrimination is not yet history"; (2) transgender status bears no relation to ability to contribute to society; (3) transgender status is a sufficiently discernible characteristic to define a discrete minority class; and (4) transgender individuals are a politically powerless minority. *Id*. at 139.

without discriminating against that individual based on sex." *Bostock v. Clayton Cty., Ga.*, 140 S. Ct. 1731, 1741 (2020).

Finally, the least stringent level of scrutiny is rational basis review. Rational basis review is applied to laws that impose a difference in treatment between groups but do not infringe upon a fundamental right or target a suspect or quasi-suspect class. *Heller v. Doe*, 509 U.S. 312, 319–321 (1993). "[A] classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity." *Id.* at 319 (citations omitted). Rational-basis review in equal protection analysis "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Id.* (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993)). Under rationale basis review, a classification "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* at 320 (quoting *Beach*, 508 U.S. at 313).[30]

b. Appropriate level of scrutiny

Plaintiffs argue heightened scrutiny is appropriate in this case because the Act discriminates on the basis of both transgender status and sex. Dkt. 22-1, at 12 (citing *VMI*, 518 U.S. at 55). Defendants acknowledge that the Act may be subject to heightened

---

[30] Yet, even under rational basis review, if a court finds that a classification is "born of animosity toward the class of persons affected," a law that implicates neither a suspect classification nor a fundamental right may be ruled constitutionally invalid. *Romer*, 517 U.S. at 634; *United States Department of Agriculture v. Moreno*, 413 U.S. 528 (1973) (striking down provision of Food Stamp Act that denied food stamps to households of unrelated individuals where the legislative history suggested Congress passed the provision in an effort to prevent "hippie communes" from receiving food stamps). Thus, even under rational basis review, a policy that is primarily motivated by animus will not pass constitutional muster. *Id.* at 534.

scrutiny but suggest the Act does not discriminate on the basis of transgender status or sex because it simply "treats all biological males the same and prohibits them from participating in female sports to protect athletic opportunities for biological females." Dkt. 41, at 13 n. 8. While contending, "[n]either the Supreme Court nor the Ninth Circuit has recognized 'gender identity' as a suspect class,"[31] the Intervenors argue the Act nonetheless passes heightened scrutiny. Dkt. 46, at 13–18. Finally, the United States contends that even assuming, *arguendo*, that the Act triggers heightened scrutiny, it "readily withstand[s] this form of review." Dkt. 53, at 5.

Because all parties focus their arguments on the Act's ability to withstand heightened scrutiny, and because the Court finds heightened scrutiny is appropriate pursuant to *Craig*, 429 U.S. at 197, *VMI*, 518 U.S. at 533, *Barron*, 286 F. Supp. 3d at 1144, and *Karnoski*, 926 F.3d at 1201, the Court applies this level of review.[32]

    c.  <u>Likelihood of Success on the Merits-Lindsay</u>

        **i**. **Discrimination based on transgender status**

Defendants and the United States suggest the Act does not discriminate against transgender individuals because it does not expressly use the term "transgender" and because the Act does not ban athletes on the basis of transgender status, but rather on the basis of the innate physiological advantages males generally have over females. Dkt. 41,

---

[31] However, as noted *supra*, the Ninth Circuit has explicitly held heightened scrutiny applies if a law or policy treats transgender persons in a less favorable way than all others. *Karnoski*, 926 F.3d at 1201.

[32] While maintaining heightened scrutiny is appropriate, Plaintiffs also argue the Act fails even rational basis review. Dkt. 22-1, at 12, 25–26. Because the Court finds provisions of the Act fail to withstand heightened scrutiny, it does not further address this argument.

at 13 n. 8; Dkt. 53, at 13. The Ninth Circuit rejected a similar argument in *Latta II*, 771

F.3d at 468. In *Latta II*, the Ninth Circuit considered defendants' claim that Idaho and

Nevada's same-sex marriage bans did not discriminate on the basis of sexual orientation,

but rather on the basis of procreative capacity. The Ninth Circuit rebuffed this contention,

explaining:

> Effectively if not explicitly, [defendants] assert that while these laws may disadvantage some same-sex couples and their children, heightened scrutiny is not appropriate because differential treatment by sexual orientation is an incidental effect of, but not the reason for, those laws. However, the laws at issue distinguish on their face between opposite-sex couples, who are permitted to marry and whose out-of-state marriages are recognized, and same-sex couples, who are not permitted to marry and whose marriages are not recognized. Whether facial discrimination exists 'does not depend on why' a policy discriminates, 'but rather on the explicit terms of the discrimination.' Hence, while the procreative capacity distinction that defendants seek to draw could represent a *justification* for the discrimination worked by the laws, it cannot overcome the inescapable conclusion that Idaho and Nevada do discriminate on the basis of sexual orientation.

*Id*. at 467–68 (emphasis in original) (quoting *Int'l Union, United Auto., Aerospace & Agr.*

*Implement Workers of Am., UAW v. Johnson Controls, Inc*., 499 U.S. 187, 199 (1991)).

Similarly, the Act on its face discriminates between cisgender athletes, who may

compete on athletic teams consistent with their gender identity, and transgender women

athletes, who may not compete on athletic teams consistent with their gender identity.

Hence, while the physiological differences the Defendants suggest support the categorical

bar on transgender women's participation in women's sports may justify the Act, they do

not overcome the inescapable conclusion that the Act discriminates on the basis of

transgender status. *Id*. at 468.

MEMORANDUM DECISION AND ORDER - 61

As mentioned, the Ninth Circuit has held that classifications based on transgender status are subject to heightened scrutiny. *Karnoski*, 926 F.3d at 1201. The Court accordingly applies heightened scrutiny to the Act. Under this level of scrutiny, four principles guide the Court's equal protection analysis. The Court: (1) looks to the Defendants to justify the Act; (2) must consider the Act's actual purposes; (3) need not accept hypothetical, *post hoc* justifications for the Act; and (4) must decide whether Defendants' proffered justifications overcome the injury and indignity inflicted on Plaintiffs and others like them. *Latta I*, 19 F. Supp. 3d at 1077. When applying heightened scrutiny, the Court does not adopt the strong presumption in favor of constitutionality or heavy deference to legislative judgments characteristic of rational basis review. *SmithKline Beecham Corp. v. Abbott Laboratories*, 740 F.3d 471, 483 (9th Cir. 2014). Further, under heightened scrutiny review, the Court must examine the Act's "actual purposes and carefully consider the resulting inequality to ensure that our most fundamental institutions neither send nor reinforce messages of stigma or second-class status." *Latta II*, 771 F.3d at 468 (quoting *SmithKline*, 740 F.3d at 483).

### ii. The Ninth Circuit's holding in *Clark*

At the outset, the Court recognizes that sex-discriminatory policies withstand heightened scrutiny when sex classification is "not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances." *Michael M. v. Superior Ct. of Sonoma Cty.*, 450 U.S. 462, 469 (1981) (upholding law that held only males criminally liable for statutory rape because the consequences of teenage pregnancy essentially fall only on girls, so applying statutory rape law solely to men was justified

since men suffer fewer consequences of their conduct). The Equal Protection Clause does not require courts to disregard the physiological differences between men and women. *Michael M*., 450 U.S. at 481; *Clark*, 695 F.2d at 1131.

As repeatedly highlighted by Defendants, the Intervenors, and the United States (collectively hereinafter the Act's "Proponents"), the Ninth Circuit in *Clark* held that there "is no question" that "redressing past discrimination against women in athletics and promoting equality of athletic opportunity between the sexes" is "a legitimate and important governmental interest" justifying rules excluding males from participating on female teams. *Clark*, 695 F.2d at 1131. In *Clark*, the Ninth Circuit determined a policy in Arizona of excluding boys from girls' teams simply recognized "the physiological fact that males would have an undue advantage competing against women," and would diminish opportunity for females. *Id*. at 1131. The *Clark* Court also explained that "even wiser alternatives to the one chosen" did not invalidate Arizona's policy since it was "substantially related to the goal" of providing fair and equal opportunities for females to participate in athletics. *Id*. at 1132.

While the Court recognizes and accepts the principals outlined in *Clark*, *Clark*'s holding regarding general sex separation in sport, as well as the justifications for such separation, do not appear to be implicated by allowing transgender women to participate on women's teams. In *Clark*, the Ninth Circuit held that it was lawful to exclude cisgender boys from playing on a girls' volleyball team because: (1) women had historically been deprived of athletic opportunities in favor of men; (2) as a general matter, men had equal athletic opportunities to women; and (3) according to stipulated facts, average

physiological differences meant that "males would displace females to a substantial extent" if permitted to play on women's volleyball teams. *Clark*, 695 F.2d at 1131. These principals do not appear to hold true for women and girls who are transgender.

First, like women generally, women who are transgender have historically been discriminated against, not favored. *See, e.g.*, *Barron*, 286 F. Supp. 3d at 1143–1145. In a large national study, 86% of those perceived as transgender in a K–12 school experienced some form of harassment, and for 12%, the harassment was severe enough for them to leave school. National Center for Transgender Equality, 2015 U.S. Transgender Survey: Idaho                          State                          Report                          1–2, https://www.transequality.org/sites/default/files/docs/usts/USTSIDStateReport%281017%29.pdf (October 2017). According to the same study, 48% of transgender people in Idaho have experienced homelessness in their lifetime, and 25% were living in poverty. *Id*. Rather than a general separation between a historically advantaged group (cisgender males) and a historically disadvantaged group (cisgender women), the Act excludes a historically disadvantaged group (transgender women) from participation in sports, and further discriminates against a historically disadvantaged group (cisgender women) by subjecting them to the sex dispute process. The first justification for the Arizona policy at issue in *Clark* is not present here.

Second, under the Act, women and girls who are transgender will not be able to participate in any school sports, unlike the boys in *Clark*, who generally had equal athletic opportunities. *Clark*, 695 F.2d at 1131; Dkt. 58-3, at ¶¶ 24–28 (explaining that forcing a transgender woman to participate on a men's team would be forcing her to be cisgender,

which is "associated with adverse mental health outcomes."); *see also* Dkt. 22-6, ¶¶ 35–37. Participating in sports on teams that contradict one's gender identity "is equivalent to gender identity conversion efforts, which every major medical association has found to be dangerous and unethical." Dkt. 58, at 11 (citing Dkt. 58-3, ¶¶ 24–28).[33] As such, the Act's categorical exclusion of transgender women and girls entirely eliminates their opportunity to participate in school sports—and also subjects all cisgender women to unequal treatment simply to play sports—while the men in *Clark* had generally equal athletic opportunities.

Third, it appears transgender women have not and could not "displace" cisgender women in athletics "to a substantial extent." *Clark*, 695 F.2d at 1131. Although the ratio of males to females is roughly one to one, less than one percent of the population is transgender. Dkt. 22-1, at 22. Presumably, this means approximately one half of one percent of the population is made up of transgender females. It is inapposite to compare the potential displacement allowing approximately half of the population (cisgender men) to compete with cisgender women, with any potential displacement one half of one percent of the population (transgender women) could cause cisgender women. It appears untenable that allowing transgender women to compete on women's teams would substantially

---

[33] The Intervenors rely on an expert opinion from Dr. Stephen Levine claiming gender-affirming policies (such as allowing transgender individuals to play on sports teams consistent with their gender identity) are instead harmful to transgender individuals. *See generally*, Dkt. 46-2. However, another judge of this Court previously determined that Dr. Levine is an outlier in the field of gender dysphoria and placed "virtually no weight" on his opinion in a case involving a transgender prisoner's medical care. *Edmo v. Idaho Dep't of Corr.*, 258 F. Supp. 3d 1103, 1125 (D. Idaho 2018) (*vacated in part on other grounds in Edmo v. Corizon*, 935 F.3d 757 (9th Cir. 2019)); *see also Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1188–89 (N.D. Cal. 2015) (noting Dr. Levine's expert opinion overwhelmingly relied on generalizations about gender dysphoria, contained illogical inferences, and admittedly included references to a fabricated anecdote). At this stage of the proceedings, the Court accepts Plaintiffs' evidence regarding the harm forcing transgender individuals to deny their gender identity can cause.

displace female athletes.[34]

And fourth, it is not clear that transgender women who suppress their testosterone have significant physiological advantages over cisgender women. The Court discusses the distinction between physical differences between men and women in general, and physical differences between transgender women who have suppressed their testosterone for one year and women below. However, the interests at issue in *Clark*—Defendants' central authority—pertained to sex separation in sport generally and are not necessarily determinative here.[35]

### iii. The Act's justifications

The legislative findings and purpose portion of the Act suggests it fulfills the interests of promoting sex equality, providing opportunities for female athletes to

---

[34] The United States suggests the Ninth Circuit held participation by just one cisgender boy on the girls' volleyball team would "set back" the "goal of equal participation by females in interscholastic sports." Dkt. 52, at 10 (citing *Clark by and through Clark v. Arizona Interscholastic Ass'n*, 886 F.2d 1191, 1193 (1989) ("*Clark II*"). The part of *Clark II* the United States references responded to plaintiff's "mystifying" argument that the Arizona school association had been "wholly deficient in its efforts to overcome the effects of past discrimination against women in interscholastic athletics, and that this failure vitiate[d] its justification for a girls-only volleyball team." *Id*. The Ninth Circuit noted that it was true that participation in Arizona interscholastic sports was still far from equal. *Id*. In light of this inequity, the *Clark II* Court could not see how plaintiff's "remedy" of allowing him to play on the girl's team would help. *Id*. Thus, the *Clark II* Court's statement regarding participation by one male athlete was in the context of plaintiff's argument that he should be permitted to play on the girl's team because there was no justification for women's teams. *Id*. The *Clark II* Court remained focused on the risk that a ruling in plaintiff's favor would extend to all boys and would engender substantial displacement of girls in school sports. *Id*. (observing that the issue of "males . . . outnumber[ing] females in sports two to one" in school sports would "not be solved by opening the girls' team to Clark *and other boys*.") (emphasis added); *see also id*. ("Clark does not dispute our conclusion in *Clark I* that 'due to physiological differences, *males would displace females to a substantial extent if they were* allowed to compete for positions on the volleyball team.") (quoting *Clark*, 695 F.2d at 1131) (emphasis added).

[35] As Attorney General Wasden advised the legislature before it passed the Act: "The issue of a transgender female wishing to participate on a team with other women requires considerations beyond those considered in *Clark* and presents issues that courts have not yet resolved." Letter from Attorney General Wasden to Rep. Rubel (Feb. 25, 2020), https://www.idahostatesman.com/latest-news article240619742.ece/BINARY/HB%20500%20Idaho%20AG%20response.pdf.

demonstrate their skill, strength, and athletic abilities, and by providing female athletes with opportunities to obtain college scholarship and other accolades. Idaho Code § 33-6202(12). Plaintiffs do not dispute that these are important governmental objectives. They instead argue that the Act is not substantially related to such important governmental interests. At this stage of the litigation, and without further development of the record, the Court is inclined to agree.

*(1) Promoting Sex Equality and Providing Opportunities for Female Athletes*

As discussed, *supra*, section II.C, the legislative record reveals no history of transgender athletes ever competing in sports in Idaho, no evidence that Idaho female athletes have been displaced by Idaho transgender female athletes, and no evidence to suggest a categorical bar against transgender female athlete's participation in sports is required in order to promote "sex equality" or to "protect athletic opportunities for females" in Idaho. Idaho Code § 33-6202(12); *see* Dkt. 1, at ¶¶ 80–83. Rather than presenting empirical evidence that transgender inclusion will hinder sex equality in sports or athletic opportunities for women, both the Act itself and Proponents' rely exclusively on three transgender athletes who have competed successfully in women's sports.

Specifically, during the entire legislative debate over the Act, the only transgender women athletes referenced were two high school runners who compete in Connecticut, and who were, notably, also defeated by cisgender girls in recent races.[36] Dkt. 22-3, Ex. B, at 8; *see also* Associated Press, *Cisgender female who sued beats transgender athlete in high*

---

[36] Rep. Ehardt also vaguely referenced a college transgender athlete, but it is not clear from the record who this athlete is or where she competed. Dkt. 22-3, Ex. B, at 8.

*school race*, https://www.fox61.com/article/news/local/transgender-athlete-loses-track-race-lawsuit-ciac-high-school-sports/520-df66c6f5-5ca9-496b-a6ba-61c828655bc6 (Feb. 15, 2020). Notably, unlike the IHSAA and NCAA rules in place in Idaho before the Act, Connecticut does not require a transgender woman athlete to suppress her testosterone for any time prior to competing on women's teams. Dkt. 41, at 33; Dkt. 45, at 7.

The Intervenors identify a third transgender athlete, June Eastwood, and argue that their athletic opportunities were limited by Eastwood's participation in women's sports. Dkt. 46, at 8. The State also highlights this example. Dkt. 41, at 18. However, Eastwood was not an Idaho athlete and the competition at issue took place at the University of Montana. Dkt. 45, at 10 n. 7. So, the Idaho statute would have no impact on Eastwood. More importantly, although the Intervenors lost to Eastwood, Eastwood was also ultimately defeated by her cisgender teammate. *Id*. And, losing to Eastwood at one race did not deprive the Intervenors from the opportunity to compete in Division I sports, as both continue to compete on the women's cross-country and track teams with ISU. Dkt. 30-1, at 2.

The evidence cited during the House Debate on H.B. 500 and in the briefing by the Proponents regarding three transgender women athletes who have each lost to cisgender women athletes does not provide an "exceedingly persuasive" justification for the Act. *VMI*, 518 U.S. at 533 ("To summarize the Court's current directions for cases of official classification based on gender: Focusing on the differential treatment for denial of opportunity for which relief is sought, the reviewing court must determine whether the proffered justification is 'exceedingly persuasive.'"). Heightened scrutiny requires that a

law solves an actual problem and that the "justification must be genuine, not hypothesized." *VMI*, 518 U.S. at 533. In the absence of any empirical evidence that sex inequality or access to athletic opportunities are threatened by transgender women athletes in Idaho, the Act's categorical bar against transgender women athletes' participation appears unrelated to the interests the Act purportedly advances.

Plaintiffs have also presented compelling evidence that equality in sports is *not* jeopardized by allowing transgender women who have suppressed their testosterone for one year to compete on women's teams. Plaintiffs' medical expert, Dr. Joshua Safer, suggests that physiological advantages are not present when a transgender woman undergoes hormone therapy and testosterone suppression. Before puberty, boys and girls have the same levels of circulating testosterone. Dkt. 22-9, at ¶ 23. After puberty, the typical range of circulating testosterone for cisgender women is similar to before puberty, and the circulating testosterone for cisgender men is substantially higher. *Id*.

Dr. Safer contends there "is a medical consensus that the difference in testosterone is generally the primary known driver of differences in athletic performance between elite male athletes and elite female athletes." Dkt. 22-9, at ¶ 25. Dr. Safer highlights the only study examining the effects of gender-affirming hormone therapy on the athletic performance of transgender athletes. *Id*. at ¶ 51. The small study showed that after undergoing gender affirming intervention, which included lowering their testosterone levels, the athletes' performance was reduced so that relative to cisgender women, their performance was proportionally the same as it had been relative to cisgender men prior to any medical treatment. *Id*. In other words, a transgender woman who performed 80% as

well as the best performer among men of that age before transition would also perform at about 80% as well as the best performer among women of that age after transition. *Id.*

Defendants' medical expert, Dr. Gregory Brown, also confirms that male's performance advantages "result, in large part (but not exclusively), from higher testosterone concentrations in men, and adolescent boys, after the onset of male puberty." Dkt. 41-1, at ¶ 17. While Dr. Brown maintains that hormone and testosterone suppression cannot fully eliminate physiological advantages once an individual has passed through male puberty, the Court notes some of the studies Dr. Brown relies upon actually held the opposite. *Compare* Dkt. 41-1, at ¶ 81 *with* Dkt. 58-2, at ¶ 7 (highlighting that the Handelsman study upon which Dr. Brown relies states that "evidence makes it highly likely that the sex difference in circulating testosterone of adults explains most, if not all, of the sex differences in sporting performance."). Further, the majority of the evidence Dr. Brown cites, and most of his declaration, involve the differences between male and female athletes in general, and contain no reference to, or information about, the difference between cisgender women athletes and transgender women athletes who have suppressed their testosterone. Dkt. 41-1, at ¶¶ 12–112, 114–125.

Yet, the legislative findings for the Act contend that even after receiving hormone and testosterone suppression therapy, transgender women and girls have "an absolute advantage" over non-transgender girls. Idaho Code § 33-6202(11). In addition to the evidence cited above, several factors undermine this conclusion. For instance, there is a population of transgender girls who, as a result of puberty blockers at the start of puberty and gender affirming hormone therapy afterward, never go through a typical male puberty

at all. Dkt. 22-9, ¶ 47. These transgender girls never experience the high levels of testosterone and accompanying physical changes associated with male puberty, and instead go through puberty with the same levels of hormones as other girls. *Id*. As such, they develop typically female physiological characteristics, including muscle and bone structure, and do not have an ascertainable advantage over cisgender female athletes. *Id*. Defendants do not address how transgender girls who never undergo male puberty can have "an absolute advantage" over cisgender girls. Nor do Defendants address why transgender athletes who have never undergone puberty should be categorically excluded from playing women's sports in order to protect sexual equality and access to opportunities in women's sports.

The Act's legislative findings do claim the "benefits that natural testosterone provides to male athletes is not diminished through the use of puberty blockers and cross-sex hormones." Idaho Code § 33-6202(11). However, the study cited in support of this proposition was later altered after peer review, and the conclusions the legislature relied upon were removed. Dkt. 58, at 17; Dkt. 58-2, at ¶ 19; Dkt. 62 at 80:10–25; 81:1–10; 95:24–25, 96. Defendants provide no explanation as to why the Legislators relied on the pre-peer review version of the article or why Defendants did not correct this fact in their briefing after the peer reviewed version was published. In fact, the study did not involve transgender athletes at all, but instead considered the differences between transgender men who increased strength and muscle mass with testosterone treatment, and transgender women who lost some strength and muscle mass with testosterone suppression. Dkt. 58, at 17. The study also explicitly stated it "is important to recognize that we only assessed

MEMORANDUM DECISION AND ORDER - 71

proxies for athletic performance . . . it is still uncertain how the findings would translate to transgender athletes." Anna Wiik et. al, *Muscle Strength, Size, and Composition Following 12 months of Gender-affirming Treatment in Transgender Individual*, J. CLIN. METAB., 105(3):e805-e813 (2020).[37]

In addition, several of the Act's legislative findings which purportedly demonstrate the "absolute advantage" of transgender women are based on a study by Doriane Lambelet Coleman. Idaho Code § 33-6202(5), (10). Professor Coleman herself urged Governor Little to veto H.B. 500 because her work was misused, and she also endorsed the NCAA's rule of allowing transgender women to participate after one year of hormone and testosterone suppression. Betsy Russell, *Professor whose work is cited in HB500a, the transgender athletes bill, says bill misuses her research and urges veto*, IDAHO PRESS https://www.idahopress.com/eyeonboise/professor-whose-work-is-cited-in-hb-a-the-transgenderarticle_0e800202-cacl-5721-a7690328665316a8.html (Mar. 19, 2020).

The policies of elite athletic regulatory bodies across the world, and athletic policies of most every other state in the country, also undermine Defendants' claim that transgender women have an "absolute advantage" over other female athletes. Specifically, the International Olympic Committee and the NCAA require transgender women to suppress their testosterone levels in order to compete in women's athletics. *Id*. at ¶ 45. The NCAA

---

[37] The legislative findings and the citations in the Proponents' briefs cite this study as Tommy Lundberg et al., *Muscle strength, size and composition following 12 months of gender-affirming treatment in transgender individuals: retained advantage for transwomen*, Karolinska Institute (Sept. 26, 2019). The correct reference for the published study is Anna Wiik et al., *Muscle Strength, Size, and Composition following 12 Months of Gender-affirming Treatment in Transgender Individuals*, J. CLIN. METAB., 105(3):e805-e813 (2020).

policy was implemented in 2011 after consultation with medical, legal, and sports experts, and has been in effect since that time. Dkt. 1, ¶ 76. Millions of student-athletes have competed in the NCAA since 2011, with no reported examples of any disturbance to women's sports as a result of transgender inclusion.[38] *Id*. Similarly, every other state in the nation permits women and girls who are transgender to participate under varying rules, including some which require hormone suppression prior to participation. The Proponents' failure to identify any evidence of transgender women causing purported sexual inequality other than four athletes (at least three of whom who have notably lost to cisgender women) is striking in light of the international and national policy of transgender inclusion.

Finally, while general sex separation on athletic teams for men and women may promote sex equality and provide athletic opportunities for females, that separation preexisted the Act and has long been the status quo in Idaho. Existing rules already prevented boys from playing on girls' teams before the Act. IHSAA Non-Discrimination Policy, http://idhsaa.org/asset/RULE%2011.pdf ("If a sport is offered for both boys and girls, girls must play on the girls team and boys must play on the boys team. . . If a school sponsors only a single team in a sport. . . Girls are eligible to participate on boys' teams. . . . Boys are not eligible to participate on girls' teams."). However, the IHSAA policy also allows transgender girls to participate on girls' teams after one year of hormone

---

[38] In their Response to the Motion for Preliminary Injunction, Defendant's highlight the circumstances of one transgender woman athlete who competed in women's sports after suppressing her hormones, Cece Telfer, to suggest testosterone suppression does not eliminate the physiological advantages of transgender women athletes. Dkt. 41, at 17–18. The Court finds, and Defendants concede, that such anecdotal evidence does not establish that hormone therapy is ineffective in reducing athletic performance advantages in transgender women athletes. *Id*. at 18.

suppression. Similarly, the existing NCAA rules also preclude men from playing on women's teams but allow transgender women to compete after one year of testosterone suppression. Because Proponents fail to show that participation by transgender women athletes threatened sexual equality in sports or opportunities for women under these pre-existing policies, the Act's proffered justifications do not appear to overcome the inequality it inflicts on transgender women athletes.

The Ninth Circuit in *Clark* ruled that sex classification can be upheld only if sex represents "a legitimate accurate proxy." *Clark*, 695 F.2d at 1129. The *Clark* Court further explained the Supreme Court has soundly disapproved of classifications that reflect "archaic and overbroad generalizations," and has struck down gender-based policies when the policy's proposed compensatory objective was without factual justification. *Id*. Given the evidence highlighted above, it appears the "absolute advantage" between transgender and cisgender women athletes is based on overbroad generalizations without factual justification.

Ultimately, the Court must hear testimony from the experts at trial and weigh both their credibility and the extent of the scientific evidence. However, the incredibly small percentage of transgender women athletes in general, coupled with the significant dispute regarding whether such athletes actually have physiological advantages over cisgender women when they have undergone hormone suppression in particular, suggest the Act's categorical exclusion of transgender women athletes has no relationship to ensuring equality and opportunities for female athletes in Idaho.

MEMORANDUM DECISION AND ORDER - 74

*(2) Ensuring Access to Athletic Scholarships*

The Act also identifies an interest in advancing access to athletic scholarships for women. Idaho Code § 33-6202(12). Yet, there is no evidence in the record to suggest that the Act will increase scholarship opportunities for girls. Just as the head of the IHSAA testified during the legislative debate on H.B. 500 that he was not aware of any transgender girl ever playing high school girls' sports in Idaho, there is also no evidence of a transgender person ever receiving any athletic scholarship in Idaho. Idaho Education News, *Lawmakers hear emotional testimony but take no action on transgender bill*, Idaho News 6,  https://www.kivitv.com/news/education/making-the-grade/lawmakers-hear-emotional-testimony-but-take-no-action-on-transgender (Feb. 20, 2020). Nor have the scholarships of the Intervenors—the only identified Idaho athletes who have purportedly been harmed by competing against a transgender woman athlete—been jeopardized. Both Intervenors continue to run track and cross-country on scholarship with ISU, despite their loss to a transgender woman athlete at the University of Montana. Dkt. 30-1, at 2.

The Act's incredibly broad sweep also belies any genuine concern with an impact on athletic scholarships. The Act broadly applies to interscholastic, intercollegiate, intramural, or club athletic teams or sports that are sponsored by a public primary or secondary school, or a public institution of higher education, or any school or institution whose students or teams compete against a public school or institution of higher education. Idaho Code § 33-6203(1). Thus, any female athlete, from kindergarten through college, is generally subject to the Act's provisions. Clearly, the need for athletic scholarships is not implicated in primary school and intramural sports in the same way that it may be for high

school and college athletes. As such, "the breadth of the [law] is so far removed from [the] particular justifications" put forth in support of it, that it is "impossible to credit them." *Romer*, 517 U.S. at 635.

Based on the dearth of evidence in the record to show excluding transgender women from women's sports supports sex equality, provides opportunities for women, or increases access to college scholarships, Lindsay is likely to succeed in establishing the Act violates her right to equal protection. This likelihood is further enhanced by Defendants' implausible argument that the Act does not actually ban transgender women, but instead only requires a health care provider's verification stating that a transgender woman athlete is female. *See, e.g*, Dkt. 40-1, at 3; Dkt. 41, at 4; Dkt. 62, at 66:21–25; 67:1–25; 68:1–17.

Defense counsel confirmed during oral argument that if Lindsay's health care provider signs a health form stating that she is female, Lindsay can play women's sports. Dkt. 62, at 66:21–25. In turn, Plaintiffs' counsel affirmed that Lindsay's health care provider will sign a form verifying Lindsay is female. *Id*. at 70:5–21. If this is indeed the case, then each of the Proponents' arguments claiming that the Act ensures equality for female athletes by disallowing males on female teams falls away. Under this interpretation, the Act does not ensure sex-specific teams at all and is instead simply a means for the Idaho legislature to express its disapproval of transgender individuals. If "equal protection of the laws means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Moreno*, 413 U.S. at 534.

*(3) The Act's Actual Purpose*

The Act's legislative findings reinforce the idea that the law is directed at excluding women and girls who are transgender, rather than on promoting sex equality and opportunities for women. For instance, the Act's criteria for determining "biological sex" appear designed to exclude transgender women and girls and to reverse the prior IHSAA and NCAA rules that implemented sex-separation in sports while permitting transgender women to compete. Idaho Code § 33-6203(3).

Specifically, an athlete subject to the Act's dispute process may "verify" their sex using three criteria: (1) reproductive anatomy, (2) genetic makeup, or (3) endogenous testosterone, i.e., the level of testosterone the body produces without medical intervention. *Id*. This excludes some girls with intersex traits because they cannot establish a "biological sex" of female based on these verification metrics. Dkt. 22-9, ¶ 41. It also completely excludes transgender girls.

Girls under eighteen generally cannot obtain gender-affirming genital surgery to treat gender dysphoria, and therefore will not have female reproductive anatomy. Dkt. 22-2, ¶ 13. Many transgender women over the age of eighteen also have not had genital surgery, either because it is not consistent with their individualized treatment plan for gender dysphoria or because they cannot afford it. *Id*. With respect to genetic makeup, the overwhelming majority of women who are transgender have XY chromosomes, so they cannot meet the second criteria. And, by focusing on "endogenous" testosterone levels, rather than actual testosterone levels after hormone suppression, the Act excludes transgender women whose circulating testosterone levels are within the range typical for

MEMORANDUM DECISION AND ORDER - 77

cisgender women.

Thus, the Act's definition of "biological sex" intentionally excludes the one factor that a consensus of the medical community appears to agree drives the physiological differences between male and female athletic performance. Dkt. 22-9, at ¶ 25. Significantly, the preexisting Idaho and current NCAA rules instead focus on that factor. That the Act essentially bars consideration of circulating testosterone illustrates the Legislature appeared less concerned with ensuring equality in athletics than it was with ensuring exclusion of transgender women athletes.

In addition, it is difficult to ignore the circumstances under which the Act was passed. As COVID-19 was declared a pandemic and many states adjourned state legislative session indefinitely, the Idaho Legislature stayed in session to pass H.B. 500 and become the first and only state to bar all women and girls who are transgender from participating in school sports. *Id*. at ¶ 89. At the same time, the Legislature also passed another bill, H.B. 509, which essentially bans transgender individuals from changing their gender marker on their birth certificates to match their gender identity. Governor Little signed H.B. 500 and H.B. 509 into law on the same day. That the Idaho government stayed in session amidst an unprecedented national shut down to pass two laws which dramatically limit the rights of transgender individuals suggests the Act was motivated by a desire for transgender exclusion, rather than equality for women athletes, particularly when the national shutdown preempted school athletic events, making the rush to the pass the law unnecessary.

Finally, the Proponents turn the Act on its head by arguing that transgender people seek "special" treatment by challenging the Act. Dkt. 53, at 9–10; Dkt. 62, at 92:16–22.

This argument ignores that the Act excludes *only* transgender women and girls from participating in sports, and that Lindsay simply seeks the status quo prior to the Act's passage, rather than special treatment. Further, the Proponents' argument that Lindsay and other transgender women are not excluded from school sports because they can simply play on the men's team is analogous to claiming homosexual individuals are not prevented from marrying under statutes preventing same-sex marriage because lesbians and gays could marry someone of a different sex. The Ninth Circuit rejected such arguments in *Latta*, 771 F.3d at 467, as did the Supreme Court in *Bostock*, 140 S. Ct. at 1741–42.

In short, the State has not identified a legitimate interest served by the Act that the preexisting rules in Idaho did not already address, other than an invalid interest of excluding transgender women and girls from women's sports entirely, regardless of their physiological characteristics. As such, Lindsay is likely to succeed on the merits of her equal protection claim. Again, at this stage, the Court only discusses the "likelihood" of success based on the information currently in the record. Actual success—or failure—on the merits will be determined at a later stage.

d.  Likelihood of Success-Jane

The Act additionally triggers heightened scrutiny by singling out members of girls' and women's teams for sex verification. *VMI*, 518 U.S. at 555 (["A]ll gender-based classifications today warrant heightened scrutiny") (internal quotation marks and citation omitted). Defendants argue that the Act does not treat females differently because "it requires any athlete subject to dispute, whether male or female, to verify his or her sex." Dkt. 41, at 13 n. 8. Defendants suggest males are equally subject to the sex verification

MEMORANDUM DECISION AND ORDER - 79

process because they may try to participate on a woman's team. *Id*. This claim ignores that all cisgender women are subject to the verification process in order to play on the team matching their gender identity, while only a limited few (if any) cisgender men will be subject to the verification process if they try to play on a team contrary to their gender identity.

Defendants' argument also contradicts the express language of the Act, which mandates, "[a]thletic teams or sports designated for females, women, or girls *shall* not be open to students of the male sex." *Id*. at § 33-6203(2) (emphasis added). Males are not subject to the dispute process because female teams are not open to them under the Act.[39] By arguing that people of any sex who seek to play women's sports would be subject to sex verification, Defendants ignore that the Act creates a different, more onerous set of rules for women's sports when compared to men's sports. Where spaces and activities for women are "different in kind . . . and unequal in tangible and intangible ways from those for men, they are tested under heightened scrutiny." *VMI*, 518 U.S. at 540.

It is also clear that a sex verification examination is unequal to the physical sports exam a male must have in order to play sports. Being subject to a sex dispute is itself humiliating. The Act's dispute process also creates a means that could be used to bully girls perceived as less feminine or unpopular and prevent them from participating in sports. And if, as the Act states, sex must be verified through a physical examination relying "only

---

[39] Moreover, males were already excluded from female sports teams under the long-standing rules in Idaho prior to the Act's passage. Defendants do not explain why women must risk being subject to the onerous sex verification process in the name of equality in sports when women already had single sex teams without the risk of a sex dispute prior to the Act's passage.

on one (1) or more of the following: the student's reproductive anatomy, genetic makeup, or normal endogenously produced testosterone levels," girls like Jane may also have to endure invasive medical tests that could constitute an invasion of privacy in order to "verify" their sex. Idaho Code § 33-6302(3).

As Plaintiffs' expert, Dr. Sara Swoboda, a pediatrician in Boise with approximately 1,500 patients across Idaho, explains, none of the aforementioned physiological characteristics are tested for in any routine sports' physical examination. Dkt. 22-10, ¶ 21. If a health care provider was to verify a patient's sex related to their reproductive anatomy, genes or hormones, none of that testing is straightforward or ethical without medical indication. *Id*. at ¶ 22. Nor would it actually "verify biological sex," "either alone or in any combination," as this "would not be consistent with medical science." *Id*. at ¶ 21.

For example, "'reproductive anatomy' is not a medical term. That could include internal reproductive organs, external genitalia, or other body systems." *Id*. at ¶ 28. Further, "medically unnecessary pelvic examination would be incredibly intrusive and traumatic for a patient" and would not be conducted. *Id*. at ¶ 29. Pelvic examinations in "pediatric patients are limited to patients with specific concerns such as acute trauma or infection," and are not conducted as a general practice. *Id*. at ¶ 27. "In young patients, such an exam would often be done with sedation and appropriate comfort measures to limit psychological trauma." *Id*. "Pediatric consensus recognizes that genitalia exams are always invasive and carry the risk of traumatizing patients if not done with careful consideration of medical utility, discussion about the purpose and subsequent findings of any exam with the patient and their family, and explicit consent of the patient." *Id*. In addition, determining

whether an individual has ovaries or a uterus may also require more intrusive testing including "transvaginal ultrasounds and may require referral to pediatric gynecologists, endocrinologists, and geneticists. None of this testing would be a necessary part of a sports physical or any standard medical examination absent medical concerns and indications of underlying health conditions necessitating treatment." *Id*. at ¶ 30.

Similarly, determining a patient's "genetic makeup" would require genetic testing. Such testing is complicated and personal and reveals a significant amount of information. *Id*. at ¶ 23. It is done by a specialist and would require a pediatric endocrinologist if performed on a minor like Jane. *Id*. at ¶ 24. Where a patient presents with a constellation of medical concerns that indicate a need for genetic testing, they are referred to a pediatric endocrinologist for a chromosomal microarray:

> This type of testing reveals a significant amount of very sensitive and private medical information. A chromosomal microarray looks at all 23 pairs of chromosomes that an individual has and would reveal things beyond just whether a person has 46-XX, 46-XY, or some combination of sex chromosomes. In ordering genetic testing of this kind, a range of genetic conditions could be revealed to a patient and a patient's family. [Dr. Swoboda does] not do genetic testing as a routine part of any medical evaluation and [is] not aware of any pediatric practice that would (absent specific medical indications). Even in cases where a patient presents with possible medical or genetic conditions based off of medical or family history that would warrant genetic testing, such testing is complex and often requires insurance preauthorization.

*Id*. at ¶ 25.

Nor would hormone testing be conducted as a part of a normal physical examination, or without clear medical indication. *Id*. at ¶¶ 21–22. Hormone testing would also require a referral to a pediatric endocrinologist and could reveal sensitive information.

MEMORANDUM DECISION AND ORDER - 82

*Id.* at ¶¶ 24, 31. "Specific testing of genetics, internal or external reproductive anatomy, and hormones could reveal information that an individual was not looking to find out about themselves and then could result in having to disclose information to a school and community that could be deeply upsetting to pediatric patients." *Id.*

Given the significant burden the Act's dispute process places on all women athletes, the Court must decide whether Defendants' proffered justifications overcome the injury and indignity inflicted on Jane and all other female athletes through the dispute process. *SmithKline*, 740 F.3d at 481–83. Instead of ensuring "long-term benefits that flow from success in athletic endeavors for women and girls," it appears that the Act hinders those benefits by subjecting women and girls to unequal treatment, excluding some from participating in sports at all, incentivizing harassment and exclusionary behavior, and authorizing invasive bodily examinations. Idaho Code § 33-6202(12). Because, as discussed above, Defendants have not offered evidence that the Act is substantially related to its purported goals of promoting sex equality, providing opportunities for female athletes, or increasing female athlete's access to scholarship, Jane is also likely to succeed on her equal protection claim. Idaho Code § 33-6202(12).

e.  <u>Irreparable Harm</u>

Lindsay and Jane both face irreparable harm due to violations of their rights under the Equal Protection Clause. "It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (internal citations omitted); *Monterey Mech. Co. v. Wilson*, 125 F.3d

702, 715 (9th Cir. 1997) (holding that an equal protection violation constitutes irreparable harm).

Beyond this dispositive presumption, Lindsay and Jane will both suffer specific "harm for which there is no adequate legal remedy" in the absence of an injunction. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). If Lindsay is denied the opportunity to try out for and compete on BSU's women's teams, she will permanently lose a year of NCAA eligibility that she can never get back. Lindsay is also subject to an Act that communicates the State's "moral disproval" of her identity, which the Constitution prohibits. *Lawrence v. Texas*, 539 U.S. 558, 582–83 (2003). When Jane tries out for Boise High's women's soccer team, she will be subject to the possibility of embarrassment, harassment, and invasion of privacy through having to verify her sex. Such violations are irreparable. *Obergefell*, 135 S. Ct. at 2606 ("Dignitary wounds cannot always be healed with the stroke of a pen."). Lindsay and Jane both also face the injuries detailed *supra*, section III.B.2, if the Act is not enjoined.[40]

The Court accordingly finds Plaintiffs will likely suffer irreparable harm if the Act is not enjoined. *Alliance for the Wild Rockies*, 632 F.3d at 1131 (noting plaintiffs must establish irreparable harm is likely, not certain, in order to obtain an injunction).

    f.  <u>Balance of the Equities and Public Interest</u>

Where, as here, the government is a party, the "balance of the equities" and "public

---

[40] The Intervenors outrageously contend that Lindsay has not shown she will suffer irreparable harm because she has not alleged that she will commit suicide if she is not permitted to participate on BSU's women's sports teams. Dkt. 46, at 2. Clearly, a risk of suicide is not required to establish irreparable harm. The Intervenors' attempt to twist the tragically high suicide rate of transgender individuals into a requirement that Lindsay must be suicidal to establish irreparable harm is distasteful.

interest" prongs of the preliminary injunction test merge. *Drakes Bay Oyster Co.*, 747 F.3d at 1092. In evaluating the balance of the equities, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. As explained above, Plaintiffs' harms weigh significantly in favor of injunctive relief.

In stark contrast to the deeply personal and irreparable harms Plaintiffs face, a preliminary injunction would not harm Defendants because it would merely maintain the status quo while Plaintiffs pursue their claims. If an injunction is issued, Defendants can continue to rely on the NCAA policy for college athletes and IHSAA policy for high school athletes, as they did for nearly a decade prior to the Act. In the absence of any evidence that transgender women threatened equality in sports, girls' athletic opportunities, or girls' access to scholarships in Idaho during the ten years such policies were in place, neither Defendants nor the Intervenors would be harmed by returning to this status quo.

Further, the Intervenors are themselves subject to disparate treatment under the Act. While the Intervenors have never competed against a transgender woman athlete from Idaho, or in Idaho, they risk being subject to the Act's sex dispute process simply by playing sports. As Plaintiffs' counsel noted during oral argument, the Act "isn't a law that pits some group of women against another group of women. This is a law that harms all women in the state, all women who are subject to . . . the sex verification process, and, of course, particularly women and girls who are transgender and are now singled out for categorical exclusion." Dkt. 62, at 89:23–25; 90:1–4.

Moreover, it is "always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002. By establishing a likelihood that the Act violates the Constitution, Plaintiffs "have also established that both the public interest and the balance of the equities favor a preliminary injunction." *Ariz. Dream Act*, 757 F.3d at 1069 ("[T]he public interest and the balance of the equities favor preven[ting] the violation of a party's constitutional rights.") (internal quotation marks and citation omitted).

g.  <u>Bond Requirement</u>

Finally, Plaintiffs request that the Court waive the bond requirement under Federal Rule of Civil Procedure 65(c). The Ninth Circuit has held that requiring a bond "to issue before enjoining potentially unconstitutional conduct by a governmental entity simply seems inappropriate because . . . protection of those rights should not be contingent upon an ability to pay." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009). In any event, Defendants do not contest Plaintiffs' request that the Court waive the bond. The Court will accordingly grant Plaintiff's request.

## IV. CONCLUSION

The Court recognizes that this decision is likely to be controversial. While the citizens of Idaho are likely to either vehemently oppose, or fervently support, the Act, the Constitution must always prevail. It is the Court's role—as part of the third branch of government—to interpret the law. At this juncture, that means looking at the Act, as enacted by the Idaho Legislature, and determining if it may violate the Constitution. In making this determination, it is not just the constitutional rights of transgender girls and

women athletes at issue but, as explained above, the constitutional rights of every girl and woman athlete in Idaho. Because the Court finds Plaintiffs are likely to succeed in establishing the Act is unconstitutional as currently written, it must issue a preliminary injunction at this time pending trial on the merits.

## V.ORDER

Now, therefore IT IS HEREBY ORDERED:

1. The Motion to Intervene (Dkt. 30) is GRANTED;

2. The Motion to Dismiss (Dkt. 40) is GRANTED IN PART and DENIED IN PART. It is GRANTED with respect to Plaintiffs' facial Fourteenth Amendment constitutional challenges, it is DENIED with respect to Plaintiffs' as-applied constitutional claims and in all other respects;

3. The Motion for Preliminary Injunction (Dkt. 22) is GRANTED.

DATED: August 17, 2020

David C. Nye
Chief U.S. District Court Judge